**Mary E. MOSES, n/k/a Mary Elaine Tenantry, Plaintiff–Appellee and Cross–Appellant,**

v.

**The DIOCESE OF COLORADO, a Colorado corporation, and Bishop William Frey, Defendants–Appellants and Cross–Appellees.**

**No. 92SA415.**

Supreme Court of Colorado, En Banc.

Nov. 15, 1993.

Rehearing Denied Dec. 6, 1993.

---

Holland, Seelen & Pagliuca, Joyce A. Seelen, Denver, Jean E. Dubofsky, P.C., Boulder, for plaintiff-appellee and cross-appellant.

Cooper & Kelley, P.C., Paul D. Cooper, John R. Mann, Denver, for defendants-appellants and cross-appellees.

Justice ERICKSON delivered the Opinion of the Court.

This appeal is from a judgment entered on a jury verdict awarding Mary E. Moses, who is now known as Mary Moses Tenantry (Tenantry), $1,216,500 as damages against the Episcopal Diocese of Colorado, a Colorado corporation (Diocese), and Bish-

op William Frey (Bishop Frey). Tenantry was a parishioner at St. Philip and St. James Episcopal Church in Denver. She sought counseling from Father Paul Robinson (Father Robinson), who was then an assistant priest at St. Philip and St. James. Although Tenantry had a long history of mental illness, her condition was relatively stable at the time she began her counseling with Father Robinson. While counseling and advising Tenantry, Father Robinson entered into a sexual relationship with her that included multiple acts of both fellatio and cunnilingus. When her relationship with Father Robinson ended, Tenantry suffered a relapse and aggravation of her mental illness. Shortly thereafter, her marriage ended in divorce. Tenantry is now under psychiatric care which will be required indefinitely.

The jury found that Bishop Frey and the Diocese breached their fiduciary duties to the plaintiff, the Diocese negligently hired and negligently supervised Father Robinson, and was vicariously liable for Robinson's breach of his fiduciary duty to Tenantry. The award consisted of $598,000 for economic damage and $618,000 for noneconomic damage. The trial judge reduced the verdict for noneconomic damage by $118,000 to comply with the statutory limit of $500,000 imposed by section 13–21–102.5, 6A C.R.S. (1987 & 1993 Supp.).

On appeal, the Diocese and Bishop Frey assert that the First Amendment of the United States Constitution forecloses recovery for clergy malpractice and an award against them for the damages sustained by Tenantry. If the First Amendment defense is valid, the remaining issues on appeal are moot. In our view, the First Amendment does not grant the Diocese and its employees immunity from liability in this case. The Diocese and Bishop Frey also assert that the evidence was insufficient to support the jury's findings.[1] We disagree in part. The evidence was sufficient to support Tenantry's claims for breach of fiduciary duty, negligent hiring, and supervision. The evidence, however, was not sufficient to prove that Robinson was acting within the scope of his employment when he engaged in oral sex with Tenantry; therefore, the Diocese is not vicariously liable for Robinson's sexual acts with Tenantry.

Tenantry asserts in her cross appeal that the trial court should not have reduced the noneconomic damage award because section 13–21–102.5, 6A C.R.S. (1987 & 1993 Supp.), is unconstitutional. Because we vacate the award predicated on vicarious liability, the noneconomic damage award does not exceed the statutory cap and the issue submitted on cross appeal is moot.[2]

---

1. On appeal, all of the evidence must be construed to support the jury's verdict if such construction is reasonable. *Lambrecht v. Archibald*, 119 Colo. 356, 203 P.2d 897 (1949); *see also City of Aurora v. Loveless*, 639 P.2d 1061 (Colo.1981) (stating if reasonable, court must interpret evidence adduced at trial to make the jury's verdict consistent).

2. Section 13–21–102.5, 6A C.R.S. (1987 & 1993 Supp.), creates a "damage cap" for "noneconomic loss or injury." Subsection 3(a) provides that "[i]n no case shall the amount of such damages exceed five hundred thousand dollars." The jury awarded Tenantry $618,000 in noneconomic damages and the trial court reduced that award to $500,000 pursuant to the statute.

 Tenantry contends that section 13–21–102.5 violates tort victims' due process and equal protection rights and the open courts provision of the Colorado Constitution embodied in article II, section 6. Although we have upheld statutory damage caps as constitutional in the past, *see State v. DeFoor*, 824 P.2d 783 (Colo.) (upholding a cap on damages in an action against a public entity), *cert. denied*, —— U.S. ——, 113 S.Ct. 483, 121 L.Ed.2d 387 (1992), we do not address the constitutionality of the $500,000 statutory damage cap because the jury erroneously found the Diocese vicariously liable for the breach of fiduciary duty by Father Robinson. When the erroneous portion of the award is vacated, the remainder of the jury award for noneconomic damages is $370,800. *See infra* note 26.

 Section 13–21–102.5(4) requires that the statutory cap "not be disclosed to a jury in any such action, but shall be imposed by the court before judgment." Therefore, the damage cap was applied by the trial judge after the jury awarded damages, and the jury's deliberation concerning the total damage award was not affected prior to the time the trial judge applied the statutory cap. Because the statutory cap could not have influenced the jury's damage award, no remand is necessary to determine the amount of damages the jury would have awarded had the trial court not applied the statutory cap.

 The statutory damage cap also limits an award for "noneconomic loss or injury" to

Accordingly, we affirm the judgment of the trial court on Tenantry's claims for breach of fiduciary duty and negligent hiring and supervision. We reverse the judgment for damages against the Diocese and Bishop Frey based upon the claim of vicarious liability, and remand with directions.

## I

### A

Tenantry and one of her older sisters, Joyce Mohr (Mohr), were sexually abused by their father when they were children. Expert testimony established that Tenantry developed a multiple personality disorder as protection against the sexual abuse by her father.[3] Before Tenantry entered grade school she had developed several separate identities.

Tenantry married Geoffrey Moses (Moses) in 1974. Moses knew of, and attempted to help Tenantry overcome, her mental illness. The couple were married for sixteen years and five children were born as issue of their marriage. Tenantry was hospitalized and attempted suicide in 1978 and 1979 because of her mental illness. While Tenantry was being treated for her mental illness, there were periods during which she was permitted to visit her children only if an outside party supervised the visitation. Father Vernon Myers (Father Myers), the priest at St. Philip and St. James Parish, often supervised these visits. The association between Father Myers and Tenantry existed before he supervised the visits because he performed the marriage ceremony for Moses and Tenantry and baptized all of their children.

After treatment for her mental illness concluded in 1979, Tenantry became an active member of St. Philip and St. James Parish. Two of Tenantry's sisters were also members of the parish and together the three sisters participated in social events, taught Bible classes, and supervised children's programs. The husbands of the three sisters were also involved in the activities of the parish and all three men served on the parish vestry—the governing board of the church. By all accounts, Tenantry's mental illness appeared to be in remission during the period that she and members of her family actively participated in church programs and activities. Tenantry's membership in the church started the longest period of improved mental health she had ever experienced.

In 1984, the vestry of St. Philip and St. James decided to hire an assistant priest because Father Myers was nearing retirement. Father Myers suggested the vestry interview Father Robinson, a newly ordained priest who would help the vestry accomplish its goal of attracting young families to the parish. Father Myers interviewed Father Robinson during his ordination period and knew that Bishop Frey considered Father Robinson to be "bishop material." Neither Bishop Frey nor the Diocese provided the church vestry with any of the information about Father Robinson contained in the Diocese's personnel files. Included in Father Robinson's personnel file were reports of psychological examinations that were conducted as a result of Father Robinson seeking ordination. These reports indicated Father Robinson had problems with depression, low self-esteem, and possessed a "sexual identification ambiguity."

Father Robinson was selected by the vestry to begin his duties as assistant priest at St. Philip and St. James Parish in June 1984. Tenantry and her husband were among many of the young couples who befriended Father Robinson and his wife.

---

$250,000 unless the court finds justification by clear and convincing evidence of damages which exceed that amount. The trial judge found by clear and convincing evidence that total noneconomic damages exceeded $250,000. The portion of the noneconomic damages awarded by the jury and supported by this decision remains over $250,000 and we agree with the trial court that there is clear and convincing evidence which justifies a noneconomic damage award over $250,000. The cross-appellant does not challenge the constitutionality of the $250,000 statutory cap.

**3.** A multiple personality disorder is a protective mechanism which may be employed by children who suffer extensive abuse. The mechanism disassociates the child from the abusive acts.

An outgrowth of Father Robinson's interaction with the young members of the parish was that a number of the women in the parish, including Tenantry and Mohr, were attracted to, and infatuated with, Father Robinson. Tenantry's brother-in-law, Michael Padbury (Padbury), warned Father Robinson that both Tenantry and Mohr were infatuated with him.[4]

In September 1984, Tenantry sought counseling with Father Robinson to discuss her fear that she was responsible for the cerebral palsy that afflicted her youngest child. At the time of these counseling sessions, Father Robinson knew Tenantry and Mohr had been sexually abused as children. Tenantry's counseling sessions with Father Robinson always ended with a prayer and a hug. The hugs eventually led to fondling, and finally, to mutual oral sex. On at least one occasion, Tenantry and Father Robinson attempted to have intercourse but were interrupted. During the course of the sexual relationship, they never had intercourse.

In mid–1985, Tenantry told Mohr about her sexual relationship with Father Robinson. Mohr confronted Father Robinson who at first denied, but then admitted, there was a sexual relationship. Father Robinson concluded his conversation with Mohr by indicating that Mohr must keep his sexual relationship with Tenantry a secret because the conversation constituted a confession. Despite Father Robinson's attempt to keep Mohr from disclosing the sexual relationship with Tenantry, Mohr discussed the conversation with her husband. While visiting another Episcopal church, Mohr and her husband consulted Father Bruce McNabb (Father McNabb) regarding whether Father Robinson had made a confession and what course of action they should take to help Tenantry. Father McNabb told Mohr she had not received a confession and was not required to keep the relationship confidential. He recommended that Mohr and her husband immediately tell Father Robinson's superior, Father Myers, about the relationship.

Acting on Father McNabb's recommendation, Mohr and her husband saw Father Myers. Mohr told Father Myers about the sexual relationship between Tenantry and Father Robinson and about Father Robinson's attempt to keep the relationship a secret. Mohr advised Father Myers that she had consulted Father McNabb and that he told her Father Robinson could not force her to be quiet. Father Myers' reaction to the sexual relationship shocked both Mohr and her husband.[5] Father Myers was angered that Mohr did not keep Father Robinson's secret and scolded her for discussing the relationship with her husband and Father McNabb. Father Myers said that Father Robinson was bishop material and that Mohr and her husband should not ruin his career. Father Myers also asked them why they were trying to destroy Father Robinson and said that Father Robinson's actions were not that bad and that Tenantry had not been injured. As a result of this meeting, Mohr's husband resigned from the vestry and the couple decided to disassociate themselves from the St. Philip and St. James parish.

After the meeting, Father Myers confronted Father Robinson and Father Robinson admitted to having oral sex with Tenantry. Father Myers told Father Robinson to be more careful in the future. Once Father Myers had spoken with Father Robinson, he involved the Diocese in the matter.[6] No action was taken by the Diocese

---

**4.** Among the difficulties Tenantry experienced as a result of the sexual abuse she suffered as a child was her inability to understand appropriate behavior or recognize accepted boundaries with respect to her relationships with men.

**5.** Evidence presented at trial indicated that Myers had known of the relationship before being confronted by Mohr. Specifically, Myers had ordered Tenantry to stop talking to Robinson before Tenantry spoke to Mohr about the relationship.

**6.** Father Myers was impeached at trial concerning whether he notified the Diocese of Tenantry and Robinson's relationship immediately after Mohr's allegations in August of 1985. In deposition, Father Myers stated that as a result of the meeting with Mohr, he confronted Robinson and then immediately involved the bishop because the bishop should be involved in any serious matter. This evidence contradicts the Diocese's assertion that it was not aware of the matter until March of 1986.

to help Tenantry after Father Myers' meeting with Mohr and her husband.

Mohr and her husband related the content and outcome of their discussion with Father Myers to Padbury, who was a member of the vestry and was married to Tenantry's oldest sister. Padbury decided that his strong relationship with Father Myers would enable him to compel Father Myers to address the issue. At a vestry retreat, Padbury confronted Father Myers about the relationship between Tenantry and Father Robinson seeking to understand what had happened. Father Myers told Padbury that he did not understand why Mohr and her husband were so upset and that there were worse things a priest could do. The response caused Padbury to question Father Myers about what action the church had taken. Father Myers indicated that he had received a "satisfactory response" from Father Robinson and was not pursuing the matter. Both Father Myers and Father Robinson attempted to ignore the situation. Father Myers also ordered Tenantry not to talk to Father Robinson.

In an attempt to separate herself from Father Robinson, Tenantry persuaded her husband to leave St. Philip and St. James and to attend Ascension Episcopal Church. By the fall of 1985, the traditional Tenantry family gatherings after church had disintegrated and Tenantry's mental illness resurfaced. The pressure of maintaining the secrecy of the affair caused Tenantry not only to deteriorate mentally but also to become physically ill. By February 1986, Father Robinson and Tenantry's sexual relationship had ended.

After leaving the church, Tenantry learned that Father Robinson had received a call to be the pastor at St. Michael's Episcopal Church in Colorado Springs. She asked her husband, Moses, about his feelings concerning Father Robinson's new position. Unaware of any relationship between his wife and Father Robinson, Moses said he was sorry to see a friend go, but it was a good job and he was happy for Father Robinson. Over the course of the next few days, Tenantry continued to tell her husband she was upset by Father Robinson's appointment and eventually told him of her sexual relationship with Father Robinson.

Moses confronted Father Robinson and Father Robinson denied, and then admitted, the existence of a sexual relationship. Moses told Father Robinson he intended to call Bishop Frey and tell him of the relationship. Father Robinson then called Father Myers who arranged to see Moses. Moses demanded Father Myers inform Bishop Frey about the relationship. Bishop Frey scheduled a meeting on March 4, 1986, with Moses, Father Robinson, and Father Myers. On March 3, 1986, the day before the scheduled meeting, Bishop Frey signed a letter which promoted Father Robinson to the position of pastor of the Colorado Springs church.[7]

At the March 4 meeting, Father Robinson admitted to a sexual relationship with Tenantry which included oral sex but not intercourse. Bishop Frey asked Moses if he would be content to let the Bishop supervise "whatever needed to happen." Moses acquiesced to Bishop Frey assuming control of the matter. Bishop Frey arranged to meet with Tenantry in order to resolve the matter. After Moses left, Bishop Frey informed Father Robinson that if this was a one-time episode, he would not mention it to the Colorado Springs parish. The Bishop also gave Father Robinson a book entitled "Affair Prevention" and told him to get counseling and to advise him immediately if the matter came up in the Colorado Springs parish.

Moses returned home and informed Tenantry that Bishop Frey wanted to see her.

---

7. Bishop Frey did not inform the vestry of Father Robinson's newly assigned parish about the allegations against Father Robinson despite the fact that Bishop Frey knew that the prior priest assigned to the Colorado Springs parish had left that church because of his illicit sexual relationship with a parishioner.

An expert who testified at trial expressed the opinion that the likelihood of a priest repeating sexual relationships with parishioners is fifty percent.

Tenantry was terrified about the loss of her salvation and feared having to meet with the Bishop. At their meeting, Tenantry described her past to Bishop Frey and explained that she had an intimate sexual relationship with Father Robinson. Tenantry discussed her fear of not having salvation because of her acts and Bishop Frey granted Tenantry absolution. At trial, Bishop Frey testified that at this meeting his impression of Tenantry was that she was fragile and had a sense of guilt that bordered on pathological because she blamed herself for the relationship.[8]

Tenantry explained to Bishop Frey that she still loved Father Robinson. Bishop Frey told Tenantry that if she loved Father Robinson she should not talk to anyone about her relationship with him, never go near the church, and never talk to Father Robinson again. Tenantry received permission from Bishop Frey to speak to a priest or counselor. Tenantry told Bishop Frey that she had discussed the relationship with her sister and asked if she needed to stop talking with her. Bishop Frey stated that the prohibition on talking to people included Tenantry's sister. Tenantry then asked if she could talk to her husband and Bishop Frey gave her permission to talk to him. The Bishop took no further action to assist Tenantry after this meeting.

Soon after her meeting with Bishop Frey, Tenantry started a day-care business and stopped participating in church activities. In 1989, she encountered Father Robinson by chance at Denver General Hospital. Tenantry reported the meeting to her husband. The reoccurrence of contact between Tenantry and Father Robinson resulted in dissolution of Tenantry's marriage. In May 1990, Tenantry and Moses separated, and in October 1990, they divorced. Subsequently, Tenantry's mental health deteriorated; she stopped spending time with her family, and her day-care business failed. At trial, mental health experts testified that the discovery of Bishop Frey's promotion of Father Robinson led to the unraveling of Tenantry's personality structure. Tenantry was diagnosed as suffering a recurrence of her multiple personality disorder and post-traumatic stress syndrome.[9]

**B**

In February 1990, Tenantry commenced a civil action against the Diocese and Father Robinson. Tenantry later amended her complaint to include Bishop Frey. Subsequently, Father Robinson filed for bankruptcy and Tenantry's claims against him were severed from the case. The jury returned a verdict finding the defendants liable for breach of fiduciary duty and negligent hiring and supervision and awarded Tenantry damages of $728,100; the jury also found the defendants vicariously liable for Father Robinson's breach of fiduciary duty and awarded $488,400.

We affirm the judgment of the trial court on the issues of breach of fiduciary duty and negligent hiring and supervision. We reverse the judgment on vicarious liability.

**II**

For the first time on appeal, the defendants have formulated First Amendment defenses that were not raised in the trial court and allegedly bar Tenantry's claims for the injuries she suffered as a result of the conduct of Father Robinson,

---

8. Subsequent to Tenantry's commencement of her legal action for damages in February 1990, Bishop Frey provided a statement to the newspapers in which he described Father Robinson as "a fine priest" and Tenantry as "an unfortunate lady."

9. These experts testified that the church provided Tenantry with a structure that helped her deal with multiple personality disorder and taught her to organize her life and to act in an acceptable way. The structure provided by the church broke down as a result of Tenantry's sexual relationship with Father Robinson because she lost her capacity to trust in God and the church. Bishop Frey aggravated the breakdown in trust when he (1) allowed her to believe that she was primarily at fault; (2) did not ask to hear her side of the affair; (3) did not ask her how she felt about the relationship or how she planned to deal with it; and (4) requested that she maintain secrecy about the relationship.

Bishop Frey, and the Diocese. The First Amendment issues raised on appeal were not properly preserved in the trial court. However, it is within our discretion to review the First Amendment defenses.[10] C.A.R. 1(d); *see Mt. Emmons Mining Co. v. Town of Crested Butte,* 690 P.2d 231, 238 (Colo.1984) (stating the exercise of discretion to notice an issue not raised below "is especially appropriate in a case involving a record that does not clearly establish the evidentiary basis for the rendition of a final judgment on substantial constitutional claims"). The First Amendment to the United States Constitution does not grant religious organizations absolute immunity from tort liability. Liability can attach for breach of a fiduciary duty, negligent hiring and supervision. *Destefano v. Grabrian,* 763 P.2d 275, 284, 286–87 (Colo.1988).

### A

The First Amendment to the United States Constitution prohibits any "law respecting the establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The amendment "embraces two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

*Watson v. Jones,* 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871), established the doctrine of judicial abstention in matters involving court interpretation of ecclesiastical law. *Watson* involved a struggle between two factions of a local Presbyterian church for control of the local church's property. *Id.* 80 U.S. at 684–85. The governing body of the Presbyterian Church of the United States ordered all members of local congregations who believed in the divine character of slavery to "repent and forsake these sins." *Id.* at 691. A minority faction of one local congregation deemed this order a deviation from the church's original doctrine. The minority faction alleged they were the true church and should control their local church's property. An ecclesiastical judiciary of the Presbyterian Church interpreted the church's law and decided which of the disputants should have possession of the local church property. The losing faction sought a contrary determination in the civil courts. The Supreme Court held that civil courts could not deprive religious bodies of the right to construe their own church laws.[11]

The Court has continued to define what are matters of purely ecclesiastical concern and has applied the doctrine of judicial abstention to cases that do not involve property disputes. *See Bouldin v. Alexan-*

**10.** The defendants' only argument at trial regarding the First Amendment was it barred admission of two pamphlets that described the hierarchical structure of the Episcopal Church. The defendants submitted a trial brief in support of their position that the pamphlets should not be admitted. In their brief, the defendants asserted that any evidence of church law or discipline should not be admitted. The defendants phrased the summary of this argument very broadly in their Rule 16 disclosure statement—"the First Amendment prevents the court from resolving any claims based upon interpretations of 'church law.'" The trial briefs and the record show that the defendants' only argument at trial was that the First Amendment barred admission of church documents in a civil court proceeding. The defendants did not argue at trial that the First Amendment forbids claims of breach of fiduciary duty, negligent hiring and supervision and vicarious liability against a religious organization.

We have consistently held, with few exceptions, issues not raised in the trial court cannot form the basis of an appeal. *See, e.g., Paine, Webber, Jackson & Curtis, Inc. v. Adams,* 718 P.2d 508, 513 (Colo.1986) (recognizing that appellate challenges to issues that do not call into question the trial court's subject matter jurisdiction and that are not raised in the trial court are waived and will not be reviewed for the first time on appeal). The fact that the non-preserved issue involves questions of constitutional analysis, interpretation, or application is not dispositive of whether we will address the issue on appeal. *See, e.g., Massey v. People,* 656 P.2d 658, 662 (Colo.1982) (declining to address a constitutional argument on appeal that was not presented for determination by the trial court).

**11.** *Watson* was decided prior to the application of the First Amendment to the states. The case, however, is the basis for later cases that adopted its rationale in applying the doctrine of judicial abstention to the states on a constitutional basis.

*der*, 82 U.S. (15 Wall.) 131, 21 L.Ed. 69 (1872) (stating civil courts have no power to question ordinary acts of church discipline, requirements for membership, or whether excommunication is proper in specific cases); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952) [12] (holding state statute that declared one faction of the Russian Orthodox Church to be the owner of certain church property an unconstitutional intrusion on the decision making ability of the church authorities); *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1968) (holding if intra-church property dispute required interpreting and weighing church doctrine, a court could not intervene; if, however, neutral principles of law could be applied without determining underlying question of religious doctrine and practice, a court could intervene); *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (forbidding judicial inquiry into whether the church judicatory body properly followed its own rules of procedure in removing a bishop from office).

The principle of these cases, as this court has recognized, is that courts must not become embroiled in disputes involving a religious organization if the court would be required to interpret or weigh church doctrine. *See Bishop and Diocese of Colorado v. Mote*, 716 P.2d 85, 102 (Colo.1986) (stating that *Jones* and its progeny do not require a court to abstain from religious controversy "as long as the inquiry does not require resolutions of disputed issues of religious doctrine"). *Mote* held that Colorado law required application of the "neutral principles" doctrine when a court is resolving a religious property dispute. *Id.* at 96. The "neutral principles" doctrine was first announced in *Blue Hull*, 393 U.S. at 449, 89 S.Ct. at 606, and allows a court to apply the neutral laws of the state to religious organizations but forbids

a court from resolving disputed issues of religious doctrine and practice. In *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), the Supreme Court of the United States explained, "[t]he neutral-principles approach cannot be said to 'inhibit' the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods." *Id.* at 606, 99 S.Ct. at 3027.

Even though *Mote* involved a church property dispute, we noted that during the turn of the century this court had held that religious corporations, "are subject to the principles of the common law and the practice and procedure applicable to corporations under the general incorporation laws, so far as the same are pertinent." *Mote*, 716 P.2d at 98 (quoting *Horst v. Traudt*, 43 Colo. 445, 96 P. 259 (1908)). We recognized in *Mote* that *Horst* was not controlling precedent but we read *Horst* as general guidance and "as a persuasive statement that this court should analyze legal issues that arise out of church organizations in the same manner as we would analyze those issues if they arose out of any other corporation or voluntary association." *Mote*, 716 P.2d at 99.

Application of a secular standard to secular conduct that is tortious is not prohibited by the Constitution. *See Mote*, 716 P.2d at 98–99; *Horst*, 43 Colo. at 448, 96 P. at 259; *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (stating that even religiously motivated conduct is not immune from neutral laws of general applicability). The Supreme Court has not granted churches broad immunity against being sued in civil courts. *See Destefano*, 763 P.2d at 284 n. 9; *see generally* Carl H. Esbeck, *Tort Claims Against Churches and Ecclesiastical Officers: The First Amendment Con-*

---

12. *Kedroff* was the first case to come before the Supreme Court involving the doctrine of judicial abstention following the application of the First Amendment's religion clauses to the states. *See Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (specifying that First Amendment, as to religion, was made applicable to the states by the Fourteenth Amendment).

*siderations,* 89 W.Va.L.Rev. 1 (1986). Civil actions against clergy members and their superiors that involve claims of a breach of fiduciary duty, negligent hiring and supervision, and vicarious liability are actionable if they are supported by competent evidence in the record. *Destefano,* 763 P.2d at 284, 286–87.

■ The facts of Tenantry's case indicate that an organization, confronted with the misdeeds of one of its agents, assumed control of the matter and in the process of protecting itself injured a vulnerable individual. The defendants have not argued that Bishop Frey's decision to assume control and resolve the problems created by Father Robinson and Tenantry's relationship was a matter of purely ecclesiastical concern. Tenantry's claims in this case do not involve disputes within the church and are not based solely on ecclesiastical or disciplinary matters which would call into question the trial court's power to render a judgment against the defendants. Our decision does not require a reading of the Constitution and Canons of the Protestant Episcopal Church or any other documents of church governance. Because the facts of this case do not require interpreting or weighing church doctrine and neutral principles of law can be applied, the First Amendment is not a defense against Tenantry's claims.

### III

■ On appeal, Bishop Frey and the Diocese have urged this court to overrule *Destefano v. Grabrian,* 763 P.2d 275 (Colo. 1988). The defendants contend the claims of breach of fiduciary duty and clergy malpractice are merely different names for professional liability. Their position is that because we refused to recognize a claim for clergy malpractice in *Destefano,* and all of Tenantry's claims relating to the negligence of the church and the acts of the church's agents are in reality claims for clergy malpractice, Tenantry's case should have been dismissed. We have declared that breach of fiduciary duty and clergy malpractice are not identical claims and involve different elements.[13] Sufficient evidence existed to allow the jury to find that a fiduciary relationship existed between Bishop Frey and the Diocese and Tenantry and that the breach of the fiduciary duty caused Tenantry's injuries.

### A

■ A prerequisite to finding a fiduciary duty is the existence of a fiduciary relationship. "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Restatement (Second) of Torts § 874 cmt. a (1979). A fiduciary relationship may arise where one party occupies a superior position relative to another. Stuart M. Speiser et al., *The American Law of Torts,* § 36:81 (1983) (stating that there are two ways to find a fiduciary relationship: it may presumed from the relationship of the parties; or, it may exist as a result of the superiority and influence that accompanies a repose of trust); *see also Bailey v. Allstate Ins. Co.,* 844 P.2d 1336 (Colo.App.1992) (recognizing that although some relationships give rise to a fiduciary duty as a matter of law, e.g., attorney-client, the nature of the claim is a relationship of trust, confidence and reliance). Although a professional relationship can be used as evidence that one party

---

**13.** *Destefano* held that a cause of action for breach of fiduciary duty was separate and distinct from a claim of clergy malpractice. The fundamental difference between the two causes of action is the former is a breach of trust and does not require a professional relationship or a professional standard of care, while the latter is an action for negligence based on a professional relationship and a professional standard of care. In *Destefano,* we held the defendant owed a fiduciary duty to the plaintiff that "was created by his undertaking to counsel [the plaintiff]."

*Destefano v. Grabrian,* 763 P.2d 275, 284 (Colo. 1988). The position of trust occupied by the defendant, when coupled with his positive act of counseling the plaintiff, resulted in a duty to the plaintiff. The relevant common facts in *Destefano* and Tenantry's case are not the profession of the defendants; the relevant facts are that the defendants in both cases occupied a position of superiority, assumed a duty to act in good faith, and then breached their duty. In Colorado, breach of fiduciary duty is actionable, clergy malpractice is not. *Id.* at 284–86.

has both the position and opportunity to influence the other party, a professional relationship is not a prerequisite to finding a fiduciary relationship. A fiduciary relationship can arise out of a relationship of blood, business, friendship, or association. Speiser et al., *supra,* § 36:81. The claim for breach of fiduciary duty in this case involves a party who used his superior position as a counselor, a bishop, and a final arbiter of problems with the clergy to the detriment of a vulnerable, dependent party.

■ The clergy-parishioner relationship is not necessarily a fiduciary relationship. It does, however, involve the type of interaction that creates trust and reliance. Courts have recognized the fiduciary nature of the clergy-parishioner relationship. *See, e.g., Destefano,* 763 P.2d at 284 (holding a priest who abuses his role as counselor can be liable for breach of fiduciary duty); *Erickson v. Christenson,* 781 P.2d 383, 386 (Or.App.1989) (same); *Adams v. Moore,* 96 N.C.App. 359, 385 S.E.2d 799, 801 (1989) (finding preacher owed fiduciary duty to parishioner and violated that duty by using his position and influence to obtain the deed to parishioner's home).

The existence of the fiduciary relationship is a question of fact for the jury. *Paine, Webber, Jackson & Curtis, Inc. v. Adams,* 718 P.2d 508, 516–18 (Colo.1986); *Tschudy v. Amos C. Sudler & Co.,* 158 Colo. 421, 426, 407 P.2d 877, 879 (1965). In this case, the jury was properly instructed on the requisite elements of a fiduciary relationship and determined a fiduciary relationship existed between Bishop Frey and Tenantry.[14] The jury's determination of a factual issue will not be reversed if the record reveals a reasonable basis to support it. *Alzado v. Blinder, Robinson & Co.,* 752 P.2d 544 (Colo.1988); *Rupert v. Clayton Brokerage Co. of St. Louis, Inc.,* 737 P.2d 1106 (Colo.1987); *City of Aurora v. Loveless,* 639 P.2d 1061 (Colo.1981).

In the meeting between Bishop Frey and Tenantry the parties did not occupy equal positions. Bishop Frey held a position of authority in the church and had the power to resolve conflicts in the church. In addition, Bishop Frey's role during the meeting was as a counselor to Tenantry, not as a representative of the Diocese or Father Robinson. If Bishop Frey was acting *only* for the Diocese and Father Robinson, he failed to convey that fact to Tenantry and led her to believe he was acting in her interest.

Bishop Frey had ordered a meeting with Tenantry and Tenantry believed he had the power to decide if she would lose her salvation. Tenantry was mentally unstable and Bishop Frey recognized that she was fragile and had a pathological sense of guilt. The superior position of Bishop Frey and the power he had over Tenantry is evinced by Tenantry's request for permission to talk to people in her family and for special permission to speak to her husband. The record supports the jury's finding that Bishop Frey was in a superior position and was able to exert substantial influence over Tenantry.

### B

■ An unequal relationship does not automatically create a fiduciary duty. In order to be liable the superior party must assume a duty to act in the dependent party's best interest. *See Hill v. Bache Halsey Stuart Shields Inc.,* 790 F.2d 817 (10th Cir.1986) (recognizing that fiduciary liability requires not only a repose of trust, but an assumption of a duty and breach of that duty); *First Nat'l Bank of Meeker v. Theos,* 794 P.2d 1055 (Colo.App.1990) (same). The defendants assert they are not liable because Bishop Frey and the Diocese did not take any action that would allow the jury to conclude they assumed a duty to Tenantry. There is sufficient evidence that the defendants assumed a duty

---

**14.** The trial court instructed the jury to consider, among other things, the extent to which Tenantry trusted the defendants; whether Tenantry's repose of trust was justified; whether the Diocese or Bishop Frey knew, or should have known, that Tenantry was relying on Bishop Frey to look out for her interests; whether the Diocese or Bishop Frey invited, accepted, or acquiesced in Tenantry's trust; and, whether the Diocese or Bishop Frey undertook to represent her interests. The defendants did not object to these instructions.

to Tenantry when they acted to resolve the problems that were the result of the relationship between Father Robinson and Tenantry.

Father Myers informed the Diocese of the relationship between Tenantry and Father Robinson as early as August of 1985. Father Myers stated he took no action after informing the Diocese because the Diocese had assumed control of the matter. The fact the Diocese had assumed control was reinforced by Bishop Frey's assumption of personal responsibility for the resolution of the matter. Bishop Frey asked Moses to rely on him to take care of "whatever needed to happen" to resolve the issues created by the sexual relationship between Tenantry and Father Robinson. Bishop Frey asked to speak to Tenantry to resolve the problem. The record supports the jury's finding that Bishop Frey and the Diocese assumed a duty on behalf of Tenantry.

■ One of the fiduciary's duties is the duty to deal "with utmost good faith and solely for the benefit" of the dependent party. *Destefano*, 763 P.2d at 284. Once a member of the clergy accepts the parishioner's trust and accepts the role of counsellor, a duty exists to act with the utmost good faith for the benefit of the parishioner. *See Destefano*, 763 P.2d at 284. The breach of the duty which the Diocese and Bishop Frey assumed is evinced by Bishop Frey's actions.

Bishop Frey had significant experience in addressing the issue of a priest's sexual involvement with a parishioner. During the course of his seventeen years as a bishop in Colorado, Bishop Frey had, on seven occasions, dealt with sexual relationships between a priest and a parishioner.

Bishop Frey also knew of Tenantry's vulnerability. Despite his experience in handling issues of clergy misconduct and his knowledge of Tenantry's extreme vulnerability, Bishop Frey took no action to help Tenantry. Acting as the representative for the Diocese, Bishop Frey failed to assist Tenantry in understanding that she was not the only person responsible for her sexual relationship with Father Robinson. He did not recommend counseling for Tenantry but did recommend counseling for Father Robinson and ordered Father Robinson to make progress reports on the counseling. Bishop Frey's only action in regard to Tenantry was to bind her to secrecy. Thus, Bishop Frey assumed control of a situation that demanded he consider Tenantry's interests and then used Tenantry's trust to her detriment.

The record supports the jury's finding that a fiduciary relationship existed between Bishop Frey and Tenantry, that the Diocese and Bishop Frey assumed a duty toward Tenantry, and that the Diocese and Bishop Frey breached their duty.

## IV

■ Bishop Frey and the Diocese contend that the jury erred in finding the Diocese negligent in hiring and supervising Father Robinson and that the alleged negligence caused Tenantry's injuries. Bishop Frey and the Diocese maintain that there was no employment relationship between the Diocese and Father Robinson and even if there was, there was insufficient evidence in the record to support these negligence claims.[15]

### A

■ An employer may be liable for harm to others for negligently employing

---

**15.** Frey and the Diocese also contend that the First Amendment of the United States Constitution was violated by the trial court when it admitted into evidence two pamphlets which helped establish the employment relationship between the Diocese and Robinson. As discussed *supra* part II, Tenantry's claims for negligent hiring and supervision are not barred by the First Amendment of the United States Constitution because neutral principles of law can be applied. In order to determine if an employ-

er-employee relationship exists, we do not have to interpret or weigh church doctrine. *See Bishop and Diocese of Colorado v. Mote,* 716 P.2d 85, 95 (Colo.1986) (quoting *Jones v. Wolf,* 443 U.S. 595, 604, 99 S.Ct. 3020, 3026, 61 L.Ed.2d 775 (1979)) (Colorado, in adopting the 'neutral-principles' doctrine, recognized "a civil court must take special care to scrutinize the [church] document in purely secular terms, and not to rely on religious precepts....").

an improper person for a task which may involve a risk to others.[16] Restatement (Second) of Agency § 213(b) (1958); *Connes v. Molalla Transport System, Inc.*, 831 P.2d 1316, 1320 (Colo.1992). It is axiomatic that a prerequisite to establishing negligent hiring is an employment or agency relationship. The existence of an agency relationship is ordinarily a question of fact to be determined by the fact finder. *Stortroen v. Beneficial Fin. Co.*, 736 P.2d 391 (Colo.1987); *Marron v. Helmecke*, 100 Colo. 364, 67 P.2d 1034 (1937). A court can only decide whether an agency relationship exists as a matter of law when the facts are not in dispute. *Stortroen*, 736 P.2d at 395; *Smith v. Davis*, 67 Colo. 128, 186 P. 519 (1920). The existence of an agency relationship can be proven by the conduct of the parties. *Victorio Realty Group, Inc. v. Ironwood IX*, 713 P.2d 424 (Colo. App.1985); *see also* Restatement (Second) of Agency § 1 cmt. a (1958) (stating "[t]he relation of agency is created as the result of conduct"). Tenantry produced sufficient evidence to raise a factual dispute on the issue of the relationship between the Diocese and Father Robinson as well as the relationship between Bishop Frey and Father Robinson. Because a dispute existed, the trial court properly submitted the issue to the jury.

Agency is ultimately a question of the intention of the parties and is evidenced by their acts and not on what the relationship is called. *Granite State Fire Ins. Co. v. Mitton*, 98 F.Supp. 706 (D.Colo. 1951), *aff'd* 196 F.2d 988 (10th Cir.1952). What is critical is that the parties materially agree to enter into a particular relation to which the legal consequences of agency attach even though those consequences might not have been contemplated by the parties at the time of their agreement. *Stortroen*, 736 P.2d at 391. An "agent" is generally one who acts for, or in place of, another, or is entrusted with the business of another. *Victorio Realty Group, Inc.*, 713 P.2d at 424.

The control a principal exercises over the manner of work performed by an agent is evidence that an agency relation exists.[17] *United States v. Young*, 736 F.2d 565, 567–68 (10th Cir.1983) *rev'd on other grounds*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). No one factor, including control, is determinative. *Dana's Housekeeping v. Butterfield*, 807 P.2d 1218, 1220 (Colo.App.1990). The most important factor in determining whether a person is an agent is "the right to control, not the fact of control." *Id.; Olsen v. Bondurant & Co.*, 759 P.2d 861, 864 (Colo.App.1988).

---

**16.** Almost invariably, in a claim for negligent hiring, the tort committed by the employee for which the employer may be held liable is an intentional tort committed outside the scope of employment. *Connes v. Molalla Transport System, Inc.*, 831 P.2d 1316, 1321 (Colo.1992). Torts committed within the scope of employment, however, may create vicarious liability. The tort of negligent hiring is a separate cause of action and does not involve vicarious liability. The principle of negligent hiring is based not on the rule of agency but on the law of torts and is therefore distinguishable from the agency doctrine of vicarious liability discussed *infra* in part V. *Id.* at 1320–21 (quoting *Di Cosala v. Kay*, 91 N.J. 159, 450 A.2d 508, 515 (1982)) ("Thus, the tort of negligent hiring addresses the risk created by exposing members of the public to a potentially dangerous individual, while the doctrine of *respondeat superior* is based on the theory that the employee is the agent or is acting for the employer. Therefore the scope of employment limitation on liability which is part of the *respondeat superior* doctrine is not implicit in the wrong of negligent hiring.").

**17.** For example, in *Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356 (10th Cir.1987), the court found sufficient control to support a jury finding of agency, albeit under a lesser standard, between the exploration company and a drilling company that had contracted to perform work as an independent contractor. The court found the following evidence established an agency relation between the drilling company (agent) and the exploration company (principal): (1) the drilling company drilled where the exploration company requested; (2) the exploration company made arrangements with local landowners to secure access and drilling rights for the drilling company; (3) an employee of the exploration company would receive complaints about the drilling company drilling on the wrong property; and, (4) that the exploration company had an employee at the drilling site on a daily basis indicating a supervisory role. *Id.* at 1360. The evidence in this case establishes sufficient control to support the jury finding of agency.

At trial, sufficient evidence was presented to establish that the structure of the Episcopal Church was such that the Diocese and Bishop Frey had and exercised the right of control over the manner of work performed by a priest as well as the hiring, compensation, counseling performed by the priest and discipline of the priest. The evidence was sufficient, in this case, to support the finding of an agency relation between the Diocese and Father Robinson.

The evidence presented at trial shows that the structure of the Episcopal Church is basically hierarchal. A pamphlet distributed by the Episcopalian Church titled "About Being an Episcopalian" (Exhibit 25) contains a chart of the "Structure of the Episcopal Church." The chart graphically shows that the bishop presides over the Diocese and the priests. A priest presides over the parish "subject to the bishop's approval." In "The Episcopal Church: Essential Facts" another pamphlet admitted during the trial (Exhibit 24), the Episcopal Church defines the role of priests: "Priests (also known as presbyters) are ordained and consecrated to assist the bishop in overseeing the Church." The pamphlet sets forth that the diocese "is governed by its bishop and a diocesan convention composed of clergy of the diocese and lay persons elected by the parishes." Vestries call rectors to serve only after consultation with the bishop.[18] Additionally, the bishop signs a letter promoting a priest to a pastor of a parish.

Other evidence presented at trial establishes the relationship among the rector, the bishop, the diocese, and the assistant priest. The rector supervises an assistant priest's counseling duties which are specifically prescribed by regulations promulgated by the Diocese. In addition, the rector in this case stated that he reported to the bishop and that the bishop made final decisions on discipline. Father Robinson testified that when a priest needs pastoral care, the priest looks to the bishop. The Diocese has independent responsibility for the employment of priests. The bishop oversees ordination, discipline, counseling, the maintenance of personnel files and the provision of information with respect to hiring. Vestries rely on the Diocese to prepare and educate candidates, to obtain psychological evaluations of candidates for ordination, and provide information about individuals who are being considered for clergy positions in the parish. While the individual priests and parishes may be independently responsible for their day-to-day activities, the Diocese exercises an employment option in the hiring of its pastors.

Gary Richard Schoener (Schoener), an expert in pastoral counseling and care and treatment of priests who have had sexual

---

**18.** The dissent distinguishes the hiring of a rector from the hiring of an assistant priest and points to evidence that the rector supervises the day-to-day duties of the assistant priest, and only the rector can terminate the assistant priest. This evidence was controverted by an expert in pastoral care who testified on cross-examination:

> Q: As a matter of fact, in the Episcopal Church, you are familiar with the fact that the bishop of an Episcopal Church does not have the right to veto [the choice of] an assistant, a curate, I am talking about a curate [assistant priest] now, not a priest.
>
> A: If you are using the term "veto" which is not a church term to refer to some sort of canon which says you can say no, yes. If you are talking about the effect of the ability to veto, you are wrong. The reality is that the bishop can influence that choice quite easily. Even if we assume, *arguendo,* that the rector has exclusive control over an assistant priest, the rector's acts are imputed to the Diocese

under the principles of agency. The Diocese and the bishop have substantial control over the rector and the rector and the Diocese, in turn, have control over the assistant priest. If the rector is a subagent of the bishop, an agent of the Diocese, and the assistant priest is a subagent of either the bishop or the rector, the actions of the rector and assistant priest are imputed to Bishop Frey and the Diocese. *See Bradbury,* 815 F.2d at 1360 (stating that because an employee of the principal exploration company supervised the day-to-day activities of an "independent contractor" drilling company, evidence existed of an agency relationship between the exploration company and the drilling company); *see also* Restatement (Second) of Agency § 5 cmt. d (1958) ("A subagent performing acts which the appointing agent has authorized him to perform in accordance with an authorization from the principal is an agent of the principal.... Furthermore, the subagent stands in a fiduciary relation to the principal, and is subject to all the liabilities of an agent to the principal....").

contact with parishioners, testified that the structure of the Episcopal Church was such that the Diocese had substantial control over hiring, compensation, counseling by priests, and discipline of priests.[19]

Schoener also testified that the Diocese is represented by the bishop. His testimony included a description of the bishop's role in the Diocese's hiring process:

First of all, the diocese and specifically the Bishop basically keeps some degree of awareness of what is going on in the training of a potential priest. The priest sent from here to a seminary stays in contact, periodically lets the bishop know how things are going in the seminary training or in the practical experience that is connected with that. In addition, periodic reports are made by the seminary or the people overseeing the actual pastoral counselor training experience to the bishop describing how the person is doing, how they are progressing and including problems or inadequacies in their work. The diocese does set policies and standards for the review of the person once they have finished seminary, and *the question is are we going to have one of our churches hire them.*

(Emphasis added.) He described the mechanism that "the diocese through the bishop" uses to evaluate the individuals who have completed seminary and seek employment. Part of the process includes having the potential priest undergo psychological evaluations. The Diocese hires a psychologist to do the evaluation and, in addition to the psychologist's own report, the Diocese requires the psychologist to complete a form supplied by the Diocese.[20] Thus, the Diocese has a mechanism for directing the psychologist's assessment.

Schoener acknowledged that the vestries make the final hiring decision but "[t]he vestries or the managing bodies of the Episcopal congregation [are] counting on the bishop for checking out the clergy. Although they do the actual hiring, they assume they are being given candidates who have a clean bill of health." Schoener noted vestries "don't do the sort of screening that an employer might do with a certain amount of detailed background check. That's presumed to be done by the diocese." He explained the control the Diocese has over the hiring process by noting, "it is the bishop and the diocese that determines in effect who is available to be called by a congregation [i.e.,] to be considered to be hired. You can't just submit your name because you finished a seminary and be available to be hired."

The evidence of the Diocese's control does not end with the evidence of its substantial input in the hiring decisions. The bishop's role, Schoener said, also includes input into a priest's compensation:

the bishop is expected to, and in this case in fact did, look after the well-being of priests and their families as regards what kind of money they get paid. For example, the bishop may not concur with an offer being made to a priest simply because the pay is not adequate or benefits are not adequate. And this file demonstrates that quite well. There is quite a bit of correspondence around money and benefits, *and that's the key thing that the priest looks to the bishop to help with. . . .*

(Emphasis added.)

The bishop's control over the manner in which priests conduct their activities also

**19.** Schoener testified that his services had been utilized by the Episcopal Church on a number of occasions and that he serves on a faculty that trains bishops, priests, and lay people to be leaders in the Episcopal church. In addition, the Episcopal House of Bishops, which Schoener described as a national office that supports bishops around the country, refers cases of sexual exploitation of parishioners to him. The cost for instructing the diocese on issues such as counseling the pastor and communicating to the parishioners is paid for by the House of Bishops.

**20.** Because the Diocese assumes this screening role, it keeps all the records on the candidates. The Diocese's file led Schoener to conclude:

[The Diocese] had a fair degree of knowledge of his background during his training process, some of the problems [Father Robinson] had. . . . they had as is their job, helped work out a game plan for him to get a job, to get a decent salary, and served in the role as a helper to he and his family, to help him come back to Colorado and get a position and to get paid decently.

includes the bishop's substantial input on discipline decisions. Schoener testified that the bishop could propose discipline and because of his "considerable influence," the vestry would comply with his recommendation:

> I guarantee you if you want the bishop to walk over to the vestry, which is the managing body, and say you have a problem here. We have to do something about it. He has to go on medical leave for a period of time until we sort this out. The likelihood the vestry will say no is very, very slim. It is an extraordinary rather rare case where if a bishop says this is what you really should do, they don't do it. Now, bishops come to me with frustrations sometimes because the churches don't do it quickly enough. The bishop often realizes the kind of liability the Diocese has and wants something done quickly, beyond dragging their feet. I haven't known a Diocese or congregation at any time to say no [to the bishop].

He pointed out that Bishop Frey addressed seven cases of sexual misconduct by priests and that his recommendations regarding discipline had been followed in all seven cases. Schoener's testimony is supported by the testimony of Father Myers who acknowledged that the bishop is the final authority in all disciplinary matters.

In addition to controlling certain aspects of hiring, compensation, and discipline, the Diocese also controls and supervises the duties of priests in their role as counselors. Schoener stated that the Diocese sets standards and rules regarding pastoral counseling and that priests "look to the diocese for some rules around pastoral counseling, ... that's where they see the rules coming from." Schoener specifically noted that Bishop Frey indicated he had given talks about national issues or standards to the

priests in the Diocese. In addition, Father Farr testified that the Diocese had specific printed regulations on pastoral counseling and that these regulations describe the form counseling should take. The regulations include such details as how appointments are to be kept, what attire is to be worn, where in the room the prayer book and desk should be, and even how the pastor should sit.

All of these facts indicate that a priest is not independent of the Diocese but is controlled by the Diocese and the bishop. The priest's education is monitored by the bishop, he is put through a screening for hire by the Diocese which includes psychological evaluation. The priest's compensation is affected by the bishop, the priest's discipline is controlled by the bishop, and every part of the form of the priest's counseling is regulated by the Diocese. The evidence at trial created a factual issue regarding whether an agency relationship existed. The trial court properly submitted this issue to the jury for determination and the jury found that there was an agency relationship between Father Robinson and the Diocese.

 Because an agency or employment relationship existed between the Diocese and Father Robinson, and Father Robinson's duties included a close relationship with parishioners, the Diocese could be liable for negligent hiring and supervision. Liability of the employer is predicated on the employer's antecedent ability to recognize a potential employee's "attribute[s] of character or prior conduct" which would create an undue risk of harm to those with whom the employee came in contact in executing his employment responsibilities.[21] *Connes*, 831 P.2d at 1321. An employer has a duty to exercise reasonable care in making his decision to hire. *Connes*, 831

---

**21.** Bishop Frey and the Diocese contend that in order to establish a claim of negligent hiring, the plaintiff must show that the employer was aware of the employee's specific propensity and that the employee has a history of criminal, tortious or otherwise dangerous conduct. We disagree. Liability for negligent hiring is not based on past conduct alone, but may also be based on character attributes of the employee.

In *Connes*, we held that liability may be predicated on the employer's hiring of a person where the employer believes that the person by "reason of some *attribute of character or prior conduct*, would create an undue risk of harm to others in carrying out his or her employment responsibilities." *Connes*, 813 P.2d at 1321 (emphasis added).

P.2d at 1320; *Island City Flying Service v. General Elec. Credit Corp.*, 585 So.2d 274, 278 (Fla.1991); *Plains Resources, Inc. v. Gable*, 235 Kan. 580, 682 P.2d 653, 662 (1984). The scope of the employer's duty in exercising reasonable care in a hiring decision depends on the employee's anticipated degree of contact with other persons in carrying out the duties of employment. *Connes*, 831 P.2d at 1321. The requisite degree of care increases, and may require expanded inquiry into the employee's background, when the employer expects the employee to have frequent contact with the public or when the nature of the employment fosters close contact and a special relationship between particular persons and the employee. *See id.* at 1322 (stating that employers who expect their employees to have frequent or close contact with others are required to go beyond the job application and perform an independent inquiry into the background of the candidate); Restatement (Second) of Agency § 213 cmt. d (1958) ("If, however, the work is likely to subject third persons to serious risk of great harm, there is a special duty of investigation.").

The duty is increased in this case because the Diocese placed Father Robinson in a position that required not only frequent contact with others, but induced reliance and trust through the counseling process. A parishioner in pastoral counseling may develop a deep emotional dependence on a priest. *See Ferguson v. People*, 824 P.2d 803 (Colo.1992). The emotional dependence is called "transference" and is a typical reaction characterized by a patient unconsciously attributing repressed feelings to the counselor. Transference is one of the most significant concepts in therapy. *See* Noyles & Kolb, *Modern Clinical Psychiatry* 505 (6th ed. 1963), *quoted in Simmons v. United States*, 805 F.2d 1363, 1365 (9th Cir.1986). A counselor must be capable of addressing these feelings, both loving and hostile.[22] *See Simmons*, 805 F.2d at 1365 (noting the counselor should look for manifestations of the transference and be prepared to handle it as it develops).

Father Robinson's duties included counseling and close association with parishioners at the church. The Diocese was in possession of a psychological report which concluded that Father Robinson has a "sexual identification ambiguity."[23] Another psychological report indicated that Father Robinson had a problem with depression and suffered from low self-esteem.[24] An expert testified that a large number of clergy who have sexual relationships with their parishioners do so partially as a result of suffering from depression and low self-esteem. Father Robinson's struggle with his sexual identity and his problems with depression and low self-esteem put the Diocese on notice to inquire further whether Father Robinson was capable of counseling parishioners. These reports gave the Diocese a reason to believe Father Robinson should not be put in a position to counsel vulnerable individuals and that might be unable to handle the transference phenomenon. The failure to communicate this knowledge to the vestry and subsequent placement of Father Robinson in the role of

**22.** Courts have routinely regarded the mishandling of transference as malpractice or gross negligence. *See, e.g., Vigilant Ins. Co. v. Employers Ins. of Wausau*, 626 F.Supp. 262 (S.D.N.Y.1986); *Aetna Life & Casualty Co. v. McCabe*, 556 F.Supp. 1342 (E.D.Pa.1983); *Waters v. Bourhis*, 40 Cal.3d 424, 220 Cal.Rptr. 666, 709 P.2d 469 (1985); *Seymour v. Lofgreen*, 209 Kan. 72, 495 P.2d 969 (1972); *L.L. v. Medical Protective Co.*, 122 Wis.2d 455, 362 N.W.2d 174 (1984).

**23.** At trial a clinical psychologist testified:

Dr. Dolby [the psychologist filing the report on Father Robinson] makes a statement [Father Robinson] has a history of sexual identi-

fication ambiguity. Although he says that [Father Robinson] functions exclusively as a heterosexual both physically and in fantasy. His marriage is apparently satisfying. I don't understand what that means. Obviously, it would be of some concern to know if he is having any sort of struggle in the area of sexual identity. That is something that I think a reasonably prudent bishop or anyone else reading this would want to know what that meant, what is the issue that has been found here.

**24.** There were two psychological reports presented at trial that were in the possession of the Diocese. The first was dated June 9, 1980, and the second April 25, 1983.

counselor breached the Diocese's duty of care to Tenantry.

## B

▮▮▮ The jury also found the Diocese was negligent in its supervision of Father Robinson. The Restatement (Second) of Agency section 213 (1958) states:

A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:

. . . .

(c) in the supervision of the activity....

Comment d states:

The principal may be negligent because he has reason to know that the servant or other agent, because of his qualities, is likely to harm others in view of the work or instrumentalities entrusted to him. If the dangerous quality of the agent causes harm, the principal may be liable under the rule that one initiating conduct having undue tendency to cause harm is liable therefor.

An employer may therefore be subject to liability for negligent supervision if he knows or should have known that an "employee's conduct would subject third parties to an unreasonable risk of harm...." *Destefano*, 763 P.2d at 288.

Both the Diocese and Bishop Frey had previous exposure to the problem of sexual relationships developing between priests and parishioners because the problem had arisen seven times before. The psychological reports gave notice that further supervision may be required. The reports indicate problems of sexual identification ambi-

guity, depression and low self-esteem. Father Robinson's file also indicated he had problems with authority. Father Robinson had an inability to respond to superior authority. A reasonable person would have inquired further into Father Robinson's known difficulty in dealing with superior authority, and would have assumed a greater degree of care in monitoring his conduct. In light of its knowledge, it was reasonable for the jury to determine the defendants should have been alert to the possibility of problems with Father Robinson and taken adequate steps to insure Father Robinson was not in a position where he could abuse the trust he enjoys as a priest conducting counseling.[25]

## V

▮▮▮ The jury determined that the Diocese and Bishop Frey were vicariously liable for Father Robinson's tortious conduct. Father Robinson, however, was not acting within the scope and course of his employment and therefore the Diocese and Bishop Frey are not vicariously liable.[26]

▮▮▮▮ The agency doctrine of vicarious liability is based on the theory of respondeat superior which postulates that a master may be liable for the acts of an agent acting on the master's behalf. *Connes*, 831 P.2d at 1320–21; *Cooley v. Eskridge*, 125 Colo. 102, 241 P.2d 851 (1952); Restatement (Second) of Agency § 213 (1958). An employer may be held vicariously liable for an employee's tort only when the tort is committed within the course and scope of employment.[27] *Deste-*

---

**25.** Father Robinson testified that he did not have any guidance on how his office could adversely affect the people he counseled. He also testified that the church does not have any procedures for priests to follow when they have trouble in counseling nor does the church have any procedure for addressing romantic or physical relationships between priests and parishioners. Father Robinson stated that the only assistance for a troubled priest is the tradition of seeking the help of the bishop.

**26.** As noted *supra* part IV(A), the jury had sufficient evidence to find that Father Robinson was an agent of the Diocese.

**27.** The scope of employment requirement restricts vicarious liability for tortious conduct to actions that "should be considered as one of the normal risks to be borne by the business in which the servant is employed." Restatement (Second) of Agency § 229 cmt. a (1958). Although the commission of an intentional tort may sometimes be within the scope of employment, the agent's intent in committing the tortious act must be to further the employer's business. *See Cooley v. Eskridge*, 125 Colo. 102, 112, 241 P.2d 851, 856 (1952) (stating authority to do an unlawful act will not be implied unless it is warranted from the nature of the employment itself) (citations omitted); *Byrd v. Faber*, 57

*fano,* 763 P.2d at 286; *McDonald v. Lakewood Country Club,* 170 Colo. 355, 461 P.2d 437 (1969). An employee is acting within the scope of his employment if he is doing the work assigned to him by his employer, or what is necessarily incidental to that work, or customary in the employer's business. *Destefano,* 763 P.2d at 287; *Russell v. First Am. Mortgage Co.,* 39 Colo.App. 360, 565 P.2d 972 (1977). We have previously held "[w]hen a priest has sexual intercourse with a parishioner it is not part of the priest's duties nor customary within the business of the church. Such conduct is contrary to the principles of Catholicism and is not incidental to the tasks assigned a priest by a diocese."[28] *Destefano,* 763 P.2d at 287; *see also Dausch v. Rykse,* 1993 WL 34873, 1993 U.S. Dist. LEXIS 1448 (N.D.Ill., Feb. 9, 1993) ("When a clergyman has sexual relations with a parishioner, particularly when he is counseling the parishioner for emo-

tional problems, his actions would clearly not be part of his ministerial duties nor customary within the business of the church." (citations omitted)).

■ There is no evidence in the record to support Tenantry's contention that Father Robinson was acting in the scope of his employment by engaging in oral sex with her.[29] In fact, the evidence in the record establishes that Father Robinson was not acting within the scope of his employment by engaging in fellatio and cunnilingus with Tenantry. Bishop Frey testified that Father Robinson's conduct was a "serious breach of [his] ordination vows." Father Robinson testified that his physical relationship was not within the scope of his employment with the church. Even Tenantry's own experts testified that Father Robinson's sexual conduct was outside the scope of his priestly duties.[30]

Ohio St.3d 56, 565 N.E.2d 584, 587 (1991) (giving the example that a bar owner employing a bouncer may be vicariously liable to a patron if the bouncer injures the patron while removing him from the premises). However, if an employee commits an intentional tort solely for reasons that do not further his employer's business or cannot be considered a natural incident of employment, the employer cannot be vicariously liable. *Cooley,* 125 Colo. at 114, 241 P.2d at 857. The scope of employment limitation on vicarious liability partially distinguishes vicarious liability from the tort of negligent hiring. *See supra* note 16.

**28.** We do not find the distinction between the Catholic priest in *Destefano,* who takes a vow of celibacy, and Episcopal priests, who are free to marry and engage in sexual acts, to be dispositive. Regardless of the denomination, when a priest engages in oral sex with a mentally ill parishioner, the priest is not acting within the scope of employment.

**29.** Although it is evident that a priest who engages in tortious sexual contact with a parishioner under the facts in this case is not acting within the scope of his employment, Tenantry nevertheless claims that the Diocese is vicariously liable because it was foreseeable that Robinson would mishandle the transference phenomenon. There is some support for the theory that reasonable foreseeability can establish vicarious liability. In *Milla v. Roman Catholic Archbishop of Los Angeles,* 187 Cal.App.3d 1453, 232 Cal.Rptr. 685 (1986), the California appellate court found that a Catholic Archdiocese could be held liable under the theory of respondeat superior for several priests' sexual contact

with a parishioner if their conduct was characteristic of the activities of the church or reasonably foreseeable. This concept was adopted in *Byrd,* 565 N.E.2d at 588. While the phenomenon of transference is foreseeable, we do not wish to expand the concept of vicarious liability as the California appellate or Ohio supreme court did. Expanding vicarious liability of a religious organization to cover foreseeable acts may well intrude into the First Amendment of the United States Constitution. Rather, the phenomenon of transference is better dealt with in this case through the claim of negligent hiring and supervision.

**30.** Questions 8, 9, and 10 of the special verdict form completed by the jury read as follows:
 **QUESTION NO. 8.** Was Robinson an agent of the defendant Diocese?
 **ANSWER:** Yes
 **QUESTION NO. 9.** If the answer to number 8 is "yes," was defendant Robinson acting within the course and scope of his agency during the events regarding Mary Tenantry?
 **ANSWER:** Yes
 **QUESTION NO. 10.** If the answer to number 9 is "yes," continue at question 11. If the answer to number 9 is "no," did the defendant Diocese ratify non-party Robinson's actions in connection with the events regarding Mary Tenantry?
 **ANSWER:** ___
Based upon the answers to questions 8 and 9, it was not necessary to answer question 10 on ratification and question 10 was crossed out by the jury. Accordingly, we do not address the issue of whether the Diocese ratified Father Robinson's actions.

The jury's finding that Robinson was acting within the scope of his employment when he had tortious sexual contact with Tenantry is erroneous as a matter of law. The Diocese is not vicariously liable for Robinson's acts of oral sex with Tenantry. We therefore order the trial court to vacate its judgment holding the Diocese and Bishop Frey vicariously liable for Father Robinson's acts.[31]

## VI

The judgment entered by the trial court is affirmed in part and reversed in part. We affirm the trial court judgment against the Diocese and Bishop Frey for breach of fiduciary duty, negligent hiring and supervision. We reverse the judgment that the Diocese and Bishop Frey are vicariously liable for the acts of Father Robinson and order the trial court to vacate the judgment predicated on the jury's finding of vicarious liability and the damages based on vicarious liability.

ROVIRA, C.J., concurs in part and dissents in part.

Chief Justice ROVIRA concurring in part and dissenting in part:

The majority holds that sufficient evidence was presented at trial to create a question for the jury regarding whether an employment or agency relationship existed between the Diocese of Colorado (diocese) and Father Paul Robinson and therefore, the diocese may be liable for the negligent hiring and supervision of Robinson.[1] For the reasons set forth below, I disagree and, accordingly, respectfully dissent.

---

**31.** An erroneous portion of a judgment may be set aside if susceptible to segregation, and the remainder of the judgment may be affirmed. *Department of Transportation v. Kendricks,* 148 Ga.App. 242, 250 S.E.2d 854, 859 (1978); *Chicago, Indianapolis & Louisville Ry. Co. v. Brown,* 157 Ind. 544, 60 N.E. 346 (1901). In this case, the jury findings in the trial court's special verdict form specifically awarded $488,400 in past and future damages and interest to Tenantry for the Diocese's vicarious liability for the acts of Father Robinson. It is this portion of the judgment we vacate.

## I

Mary Moses (plaintiff) was a parishioner at St. Philip and St. James Episcopal Church. Father Vernon Meyers was the head priest and rector of that parish. Father Paul Robinson was employed as an assistant priest at St. Philip and St. James. The parish is one local body of the Episcopal Diocese of Colorado. Bishop William Frey was the head of the diocese.[2]

## II

The majority correctly observes that "a prerequisite to establishing [a claim of] negligent hiring is an employment or agency relationship." Maj. op. at 324. Though not expressly stated by the majority, a finding of employment or agency, similarly, is a prerequisite to a claim of negligent supervision. *See* Restatement (Second) of Agency § 213 (1958). The question of agency is ordinarily a factual one, properly resolved by the trier of fact when conflicting evidence of agency is presented. *Stortroen v. Beneficial Fin. Co.,* 736 P.2d 391, 395 (Colo.1987). A court may, however, properly decide whether an agency relation exists when the relevant facts are not in dispute. *Id.*

While the majority points to several facts in support of its conclusion that the evidence presented was sufficient to create a factual dispute respecting whether the relationship between the diocese and Father Robinson was one of either agency or employment, those facts do not create such a dispute because they have no bearing on the critical elements needed to establish the existence of either of these legal relationships. Because the evidence pertaining to

---

**1.** It is unclear whether the majority concludes that the evidence supports a finding of either agency or employment, or both. Because the requirements for finding an employer-employee relation differ from those needed to find an agency relation—but either finding could support a claim for negligent hiring and supervision—I address each issue separately.

**2.** Other relevant facts and information are detailed in the majority opinion, repetition of which is unnecessary here.

those decisive elements was undisputed and cannot, as a matter of law, support a finding of an agency or employment relationship, the Diocese of Colorado cannot be held liable for the negligent hiring and supervision of Father Robinson.

### A

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Stortroen v. Beneficial Fin. Co.*, 736 P.2d 391, 395 (Colo.1987) (quoting Restatement (Second) of Agency § 1(1) (1957). *See also Montano v. Land Title Guarantee Co.*, 778 P.2d 328, 331 (Colo.App.1989).

> The agency relation results if, but only if, there is an understanding between the parties which, as interpreted by the court, creates a fiduciary relation in which the fiduciary is subject to the directions of the one on whose account he acts. *It is the element of continuous subjection to the will of the principal which distinguishes the agent from other fiduciaries and the agency agreement from other agreements.*

Restatement (Second) of Agency § 1 cmt. b (1958) (emphasis added); *United States v. Young*, 736 F.2d 565, 567–68 (10th Cir. 1983) *rev'd on other grounds*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (holding that a showing of mere subordination to another is insufficient to establish agency or employment; the "right to control" must be shown under common law requirements); W. Edward Sell, *Sell on Agency* § 2 at 2 (1975) ("The agent differs from most other fiduciaries such as executors, trustees, etc., in that he remains under the continuous control of the principal as to matters relating to the object of his agency, throughout the entire period of his agency."); 2A C.J.S. *Agency* § 6 (1972) ("The right to control ... is the primary or essential test of agency ... without which

no agency exists...."). As this authority makes clear, the *sine qua non* of the agency relationship is the right of continuous control by the principal over the acts of the agent. Thus, I agree with the majority's conclusion that "[t]he most important factor in determining whether a person is an agent is 'the right to control, not the fact of control.'" Maj. op. at 324 (quoting *Dana's Housekeeping v. Butterfield*, 807 P.2d 1218, 1220 (Colo.App.1990)).

The uncontradicted evidence presented at trial established that the diocese neither had the right of continuous control over Father Robinson nor exercised that "right." Indeed, no evidence was presented which created even the inference that the diocese was vested with such power over Father Robinson. Canon 14(a) of the Episcopal Church provides that "[a]ll assistant Clergy ... shall be selected by the rector ... and shall serve under the authority and direction of the Rector." *Constitution & Canons for the Government of The Episcopal Church* Title III, canon 14(a) at 80 (1988). Numerous witnesses testified that it was the rector at St. Philip and St. James Parish who gave Father Robinson his assignments and who instructed him as to how to carry out his day-to-day duties. Those same witnesses testified that those day-to-day activities would be supervised and controlled by the rector, and not the diocese or the bishop. Father Charles Farr,[3] Father Meyers, and Gary Schoener,[4] all were in complete agreement on these points. In short, the evidence established, as the majority concedes, that individual rectors are "independently responsible for their [assistant priests'] day-to-day activities." Maj. op. at 325.

The fact that the individual rectors, and not the bishop or diocese, are charged with overseeing the day-to-day activities of assistant priests weighs heavily against a finding that an agency relation exists. *See* Restatement (Second) of Agency § 1 cmt. b (1958); maj. op. at 325. The power to

---

**3.** Father Farr, who testified on behalf of plaintiff, was the rector at the Church of the Epiphany, another Episcopal Church located in Denver.

**4.** Schoener, who was qualified as an expert in the area of pastoral counseling and the care and treatment of offending priests, also testified on behalf of plaintiff.

control and oversee Robinson's day-to-day activities is the method which, by definition, continuous control is exerted over him. Because it was the rector at St. Philip and St. James, and not the bishop or diocese, who exerted continuous control over Robinson, I would hold that no evidence was presented at trial to support the jury's verdict that an agency relation existed between Robinson and the diocese and that, as a matter of law, no such relation was established here.

### B

The majority additionally concludes that "the Diocese exercises an employment option in the hiring of its pastors." Maj. op. at 325. Like continuous control in the context of agency, the power of continuous control is a critical element, or prerequisite, to finding an employer-employee relationship. *Jacobson v. Doan,* 136 Colo. 496, 503, 319 P.2d 975, 978 (1957) ("The determination of whose servant an employee is in a given case depends on who has the right to control him."); *Magnuson v. Smith and Saetveit, P.C.,* 722 P.2d 1020, 1022 (Colo. App.1986) ("The central element in an employer-employee relationship is the right of the employer to control the details of performance of the employee's duties."); *Miller v. Hirschbach Motor Lines, Inc.,* 714 S.W.2d 652, 658 (Mo.App.1986) (control over discharge of duties is a "preeminent characteristic" of employer-employee relationship). *See also* Restatement (Second) of Agency § 220 (1958). Other particularly probative indicators of an employment relationship include the power to hire and terminate, *see e.g. King v. Southwestern Greyhound Lines,* 169 F.2d 497, 499 (10th Cir.), *cert. denied,* 335 U.S. 891, 69 S.Ct. 245, 93 L.Ed. 428 (1948) (noting that numerous courts have held that the right to terminate a contract for services creates an employer-employee relationship as a matter of law); *Hirschbach Motor Lines, Inc.,* 714 S.W.2d at 658 ("no single fact is more conclusive of the existence of the nature of the employment [relationship] than the right to discharge summarily"), and whether the purported employer pays the salary of or otherwise compensates the alleged employee. *See Jacobson v. Doan,* 136 Colo. 496, 319 P.2d 975 (1957). In sum, the dispositive elements needed to show an employer-employee relationship are:

> whether [the alleged employer] selected or employed [the employee]; whether wages or other consideration were to be paid; whether [the alleged employer] had the power or right to dismiss and the right to control [the alleged employee]. The central element is the right to control the details of performance.

CJI–Civ.3d 7:6 (1989).

As noted above, the undisputed evidence reveals that the diocese neither had nor exercised the right to control Father Robinson's day-to-day activities. Similarly, the undisputed evidence established that the diocese did not have the power or authority to either hire or terminate Father Robinson. Canon 14(a) provides that "[a]ny assistant selected shall serve at the discretion of the Rector...." *Constitution & Canons for the Government of The Episcopal Church* Title III, canon 14(a) at 80 (1988). Father Farr testified that an assistant priest serves at the pleasure of the rector, and only the rector can terminate the priest. Father Farr also stated that a bishop's approval is not needed prior to termination. Schoener testified that Bishop Frey did not have the authority to remove Father Robinson from his priestly duties. Rather, Schoener testified that "in that regard the church is the direct supervisor of that, that they have to make that decision."

Marie Fortune, another expert who testified on behalf of plaintiff, acknowledged that it was Father Meyers who presented Father Robinson to the vestry with the recommendation that he be hired. Meyers also conceded that the diocese had no "vote" in that matter. Furthermore, Meyers agreed that an assistant priest serves at the pleasure of the rector, and it is he who is charged with determining the priest's employment status.

Finally, it was undisputed that the parish, acting through its vestry, was the entity which compensated Robinson for his services, and not the diocese or Bishop Frey.

Again, Bishop Frey, Father Farr, and Father Meyers all confirmed this fact.

The diocese did not have the power to control Father Robinson's day-to-day activities. Nor did it have the power or authority to initiate or terminate Robinson's employment with the parish.[5] Finally, it was the parish of St. Philip and St. James that was responsible for compensating Robinson, not the diocese.

Thus, I am of the opinion that the uncontradicted evidence precludes, as a matter of law, a finding that the diocese and Father Robinson occupied an employer-employee relationship.

### III

The majority, however, points to number of facts about the structure of the Episcopal Church and places primary reliance on the testimony of Schoener in support of the conclusion that sufficient evidence was presented to create a jury question as to whether Robinson was either an agent or employee of the diocese. In my opinion, none of those facts support the conclusion for which they are enlisted, because none of them relate to the critical elements needed to establish an agency or employment relationship. The facts presented by the majority fall into two broad categories, each of which will be addressed in turn.

### A

The first category of facts on which the majority relies in reaching its conclusion concerns the relationship among a diocese, bishop, and rector or head priest of a parish. Maj. op. at 325–326. Standing alone, all of these facts are entirely irrelevant to determining the legal relationship between Robinson and the diocese because Robinson was an assistant priest, not a rector. As common sense would suggest, extensive and uncontroverted evidence was presented at trial to establish that an assistant priest

is not a rector, and that the duties, responsibilities, and supervisory relationships of rectors and assistant priests differ.

The majority apparently cites these facts, not to show that assistant priests and rectors are one and the same, but to establish that the doctrine of subagency is applicable here and that therefore, Robinson's conduct as a subagent of Meyers, who is an agent of the diocese, can be imputed to the diocese. Maj. op. at 325 n. 18.

The doctrine of subagency is set forth in the Restatement of Agency as follows: "A subagent is a person appointed by an agent empowered to do so, to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible for." Restatement (Second) of Agency § 5(1) (1958). In order to establish a subagent relation, it must be shown that the agent of the principal had agreed to be primarily responsible for the conduct of the alleged subagent. *See id.; Estate of Greenberg v. Skurski*, 95 Nev. 736, 602 P.2d 178, 179 (1979). In my opinion, while the doctrine of subagency could have been relied on here, the fact is, it was not.

The only instruction concerning the establishment of either an agency or employment relationship which the trial court tendered was Jury Instruction 23. That instruction provided:

The term principal and agent refers to the relationship which exists when one person, the principal, retains another, the agent, to do certain work. In determining whether the relationship exists you should consider whether the Diocese of Colorado and/or Bishop William Frey selected or retained Father Robinson; whether wages or other consideration were to be paid by them; whether the Diocese of Colorado and/or Bishop William Frey had the power or right to dismiss and the right to control Father

---

5. In my opinion, it strains credulity to conclude that one who lacks the power either to hire or terminate an "employee" can nevertheless occupy the position of employer with respect to hiring that employee. I for one am unable to see how the diocese could have been negligent in *hiring* Father Robinson when the undisputed evidence established not only that the diocese could not, but, in fact did not, hire Robinson.

Robinson. The central element is the right to control the details of performance. It matters not whether the Diocese of Colorado and/or Bishop William Frey actually exercised any right to control Father Robinson.

This was the only instruction proffered to the jury regarding the question of how, and whether, an agency or employment relationship exists. Consequently, no other possible legal bases for finding such relationships under the facts of this case could have been considered by the jury in reaching its verdict. Because the jury could not have concluded that Robinson was a subagent of the diocese, evidence which tends to establish subagency cannot be used to establish that evidence was presented either to create a question for the jury or to support the jury's verdict. Therefore, the majority's reliance on this first category of evidence is, in my opinion, misplaced, and in no way supports the conclusion that sufficient evidence was presented to create a jury question.

### B

The second category of evidence cited by the majority concerns the relationship among the diocese, bishop, and assistant priests, and is culled almost exclusively from the testimony of Gary Schoener. While I concede that the evidence cited by the majority establishes that a bishop can exert *influence* over assistant priests, such influence falls far short of establishing the requirements needed to prove an agency or employment relationship.

First, it is important to reiterate that the majority does not contend that either the bishop or diocese controlled the day-to-day activities of Father Robinson. Maj. op. at 325. Rather, the majority concedes that "individual priests and parishes may be independently responsible for [assistant priests'] day-to-day activities...." *Id.*[6] In spite of the fact that this critical element is lacking, the majority nevertheless concludes that the "Diocese exercises an employment option in the hiring of its priests." *Id.*

The majority notes that "[t]he rector supervises an assistant priest's counseling duties...." Maj. op. at 325. This is indicative of the fact that it is the rector, and not the bishop or diocese, that exerts continuous control over assistant priests. The fact that those counseling duties "are specifically prescribed by regulations promulgated by the Diocese," *id.*, in no way alters this conclusion for the simple reason that pastoral counseling is only one of myriad duties and activities in which an assistant priest engages. In addition, this fact has no bearing on the question of the power to hire, terminate, or compensate assistant priests.

Similarly, though a priest may look to the bishop for "pastoral care," *id.*, this fact is inapposite to the question of whether the bishop exerts continuous control over the conduct of the assistant priest. In fact, Schoener testified that an assistant priest would consult with a bishop only in exceptional circumstances. Likewise, even if the bishop has "independent responsibility" for the employment of assistant priests (including overseeing ordination, discipline, counseling, and maintenance of personal files), *id.*, the sort of independent responsibility identified by the majority has no relevance to the question of whether the diocese exerts continuous control over the daily conduct of assistant priests, whether the diocese has the power to actually hire and terminate assistant priests, or whether the diocese compensates assistant priests. Finally, the fact that vestries rely on the bishop and diocese to prepare candidates and provide information about them is entirely irrelevant to the questions of control, employment decisions, and duty to compensate.

---

**6.** While the majority acknowledges this fact, it nevertheless concludes that "Bishop Frey had and exercised the right of control over the manner of work performed by a priest as well as the hiring, compensation, and counseling performed by the priest and discipline." Maj. op. at 325. Irrespective of whatever inconsistency there may be in maintaining both of these propositions simultaneously, for the reasons that follow, I disagree that Bishop Frey had or exercised the right of control as described by the majority.

In addition to the aforementioned facts, the majority quotes at length the testimony of Schoener as it related to his "description of the bishop's role in the Diocese's hiring process...." Maj. op. at 326, 326–327. Though I acknowledge that the Diocese does indeed play a role in the hiring of assistant priests—i.e., having "substantial input in the hiring decisions," maj. op. at 327—the majority fails to point to any evidence which established that the diocese is actually vested with the authority to hire or terminate assistant priests.

The closest the majority comes to pointing to such evidence is Schoener's statement that "it is the bishop and the diocese that determines in effect who is available to be called by a congregation [i.e.,] to be considered to be hired. You can't just submit your name because you finished a seminary and be available to be hired." Maj. op. at 326. However, Schoener also acknowledged that a given diocese determines who is available to be called only if a parish looks to that diocese for hiring guidance. Schoener stated that a parish is not bound to look only to candidates who have been approved by that parish's diocese. In fact, Schoener stated that in most states, local parishes look outside their own diocese for assistant priests. Furthermore, Schoener testified that St. Philip and St. James was in no way required or obligated to look only to the Diocese of Colorado for eligible candidates. Thus, a given diocese actually exerts much less influence in the hiring process than one could otherwise be led to assume. The majority, however, apparently misconstrues the extent to which a given parish is dependent on its diocese in the hiring of assistant priests, by concluding that the Diocese of Colorado exercises an employment "option," maj. op. at 326, with respect to the hiring of assistant priests at the diocese's parishes.

The majority also paraphrases Schoener's testimony regarding the influence a bishop may exert over disciplinary decisions as follows: "the bishop could propose discipline and because of his 'considerable influence,' the vestry would comply with his recommendation...." Maj. op. at 327.

Schoener did indeed testify as to the influence a bishop could exert in such matters, however he stated only that the likelihood of a vestry ignoring a bishop's advice was "very, very slim." Nevertheless, he acknowledged not only that sometimes parishes do not follow the advice of a bishop quickly enough but specifically recognized that vestries and churches do not always follow the advice of a Bishop: "If you talk to bishops," Schoener stated, "you will learn about that." Regardless of the precise scope of a bishop's influence in matters of discipline, nowhere was it ever suggested that such influence rises to the level of continuous control or that such influence extends to the actual hiring, termination, or duty to compensate assistant priests.

Finally, the fact that an assistant "priest's compensation is affected by the bishop," has nothing to do with the critical elements needed to establish an agency or employment relationship. The ability to affect the rate of compensation certainly cannot be equated with the power to actually hire or terminate employment. Nor is this ability to "affect" tantamount to a duty of compensation. The jury was specifically instructed that they should consider "whether wages or other consideration were to be paid by them [i.e., Bishop Frey or the diocese]," in determining whether an employment relation existed between Robinson and the diocese. See supra p. 334–335 (quoting Jury Instruction 23). The jury was not instructed to consider whether the diocese could "affect" the rate at which Robinson was compensated and therefore, the fact of such an ability cannot create a dispute properly resolved by the jury. Furthermore, it was undisputed that the bishop and diocese did not compensate Robinson, but that the parish, acting through its vestry, did.

### C

Thus, the considerable number of facts and lengthy testimony cited by the majority do not support the conclusion that the diocese was either the principal or employer of Father Robinson, because none of those facts establish that the diocese had continuous control over Robinson, was

vested with the power to terminate his employment with the parish, or had the duty to compensate him for his services.[7] Though these facts do establish that Bishop Frey and the diocese were capable of exerting influence over the conduct of an assistant priest, such an ability cannot establish either an agency or employment relationship nor can it create a factual dispute as to whether such relationships exist.

The jury was properly instructed that in order to find an employment relation between the diocese and Robinson, they should consider whether: (1) the diocese selected or retained Robinson; (2) wages or other consideration were to be paid by them; (3) the diocese or bishop had the power to terminate Robinson; and (4) the diocese or Bishop Frey had the right to control Robinson. *See supra* p. 334–335 (quoting Jury Instruction 23). The majority concedes that the fourth, and "critical," element of control is wanting here because it is the rector who controls an assistant priest's day-to-day activities. Furthermore, the majority nowhere states or concludes that the diocese hired Robinson, had the duty to compensate Robinson, or had the actual ability to terminate Robinson's employment with the parish.

In short, the majority never contends that *any* of the elements that the jury was instructed to consider in determining whether an employment relation existed between the diocese and Robinson have been met here. Rather, all of the evidence cited establishes only that the bishop and diocese

can exert influence over an assistant priest. The jury was not, however, instructed that "influence" alone could either support a finding of an employment relation or that such a fact should even be considered by them. Thus, the fact that such influence exists cannot support the conclusion that sufficient evidence was presented to either create a question for the jury or to support the jury's verdict.

Consequently, I would hold that the trial court erred in denying defendant's directed verdict motion dismissing plaintiff's claim for negligent hiring and supervision. Accordingly, I concur in the result in Part III, concur in Part V, and dissent from Part IV of the majority opinion.

---

**7.** This conclusion is supported by recognition that, standing alone, many of the facts cited by the majority occur in contexts which could in no way be regarded as agency or employment relations. For example, to the extent that the bishop oversees ordination, discipline, and the maintenance of personal files on prospective assistant priests, he is not unlike this court, which is vested with the power and obligation to oversee the admittance, discipline, and maintenance of personal files on members of the Colorado Bar. Similarly, to the extent that vestries rely on the diocese to prepare and educate candidates, they are not unlike government agencies and law firms who rely on law schools to properly train and educate prospective attorneys. In this sense, this court and law schools are similarly vested with "independent responsibility" for the employment of lawyers. This fact does not of course, nor could it, support a

conclusion that either the supreme court or law schools occupy an agency or employment relation with respect to all attorneys practicing in Colorado.

Likewise, while a bishop can "affect" an assistant priest's compensation, many people and organizations similarly affect the compensation paid to others while not occupying an employment relationship with them. For example, a labor union can affect the rate of compensation and nature of benefits paid to its members. Similarly, state and federal governments can affect the compensation of others by mandating minimum wage requirements or payment of disability or unemployment benefits. It could not, however, be argued that simply because such organizations and institutions affect the compensation paid to others in these ways, that they are therefore the employers of those affected.