## No. 16,252.

WALTER BREWING COMPANY *v.* HODER.

(230 P. [2d] 170)

Decided April 9, 1951.

Mr. L. E. LANGDON, for plaintiff in error.

Messrs. McGARRY & THOMAS, for defendant in error.

*En Banc.*

MR. JUSTICE HILLIARD delivered the opinion of the court.

A CASE involving an oral contract, and a subsequent oral modification thereof. More particularly, the controversy involves the modification feature. Plaintiff Hoder, defendant in error, as successor to earlier parties in interest, and defendant, Walter Brewing Company, plaintiff in error, will be referred to as designated in the court below, where plaintiff enjoyed favorable verdict and judgment. Plaintiff, as well as his predecessors in interest, resided in El Paso county, while defendant, a corporation, has its principal place of business and general offices in Pueblo county.

It is not disputed that early in 1940, plaintiff was engaged in the distribution of two eastern beers in several Colorado counties, including El Paso; that in March of that year, plaintiff and defendant entered into an oral agreement whereby plaintiff became distributor of defendant's product in El Paso county (and some additional territory), with certain profits to accrue therefrom. Prior thereto defendant had operated as its own distributor in the El Paso county territory, but seemingly was not satisfied with that arrangement. In aid of its then operation it had there a warehouse, two trucks, a walk-in ice box, and an ice machine. It had one special employee, Noel Moats, in whose continued employment it was interested. There was testimony in behalf of plaintiff that as a part of the consideration for the exclusive agency for the distribution of defendant's product in the territory hereinbefore stated, plaintiff purchased some of defendant's said equipment for one thousand

dollars, employed Moats, and began the distribution of defendant's beer in the alloted territory. There is not a hint that either party regarded the contract other than as valid and binding, and both parties scrupulously performed in accordance with their agreement for approximately two years, both profiting modestly as they went along. Seemingly, had conditions remained as they were in 1940, no dispute would have arisen.

But in December, 1941, the Japanese Empire struck at Pearl Harbor, and our country was at war. A change of immense magnitude took place in the territory covered by the contract. All lines of business were affected, including the beer business. Camp Carson was established in El Paso county, bringing in soldiers by the thousands. Their patronage was well worth-while, and plaintiff set about trying to get it. Success did not attend immediately, but finally, he testified, the camp purchasing agent approached him relative to the matter, and that said agent likewise called on defendant in its office in Pueblo. Be that as it may, the picture had changed, and before long defendant was supplying its brand of beer to the soldiers of Camp Carson. What in the beginning had been a routine business arrangement with modest profits for both plaintiff and defendant, became overnight, as it were, a business of great magnitude, and of unanticipated profits. Passing for the moment consideration of the whys and wherefores thereof, and the relative rights and liabilities of plaintiff and defendant as between themselves, it was not long before defendant, instead of delivering the required amount of its product to plaintiff at Pueblo for wholesale distribution in the territory comprehended in the contract, was making direct delivery of the required amount to Camp Carson, in El Paso county.

1. A preliminary inquiry is, Did plaintiff have an exclusive contract to serve outlets for defendant's beer in El Paso county? Plaintiff and several witnesses, including his wife, testified that such an agreement was

made. Karl Walter for defendant, testified otherwise. The jury, proceeding in the light of unchallenged instructions, resolved the question in favor of plaintiff. There is much in the record otherwise, as our study convinces, to support the resolution of the jury.

■ ■ 2. On the premise of the foregoing, Is Camp Carson, the place and cause of the large increased sales of the product of defendant's brewery, and, although in El Paso county, and which was nonexistent at the time of the established contract, to be eliminated from the reckoning of profits to be shared by plaintiff? We are not of that view. "It is well established that the grant of an 'exclusive agency' to sell, i.e., the exclusive right to sell the products of a wholesale dealer in a specified territory ordinarily is interpreted as precluding competition by the principal in any form within the designated area." *Navy Gas & Supply Co. v. Schoech,* 105 Colo. 374, 98 P. (2d) 860. Counsel for defendant cites *Anheuser-Busch, Inc. v. Grovier-Starr Produce Co.,* 128 F. (2d) 146. We do not regard that case as in point. It involved the authority of an agent to make a certain contract, not the effect thereof. All the circumstances considered, we believe that when the agreement was made in 1940, "the intention of the parties" (Schoech case, supra) was that plaintiff would be the sole distributor for Walter's beer in El Paso county. Neither party, of course, foresaw or anticipated that a large military camp was to be installed there in 1942. That plaintiff wrought a better contract than he knew, and that defendant did not know how easy it would be to sell its entire product by that time, may not be held to void the contract. Plaintiff's insistence on its observance by defendant was that of any ordinary business man pressing his advantage. It cannot be the function of courts to withhold the fruits of a contract on the ground they were richer than anticipated. It is significant, we think, that defendant did not question the contract while plaintiff was realizing but little money therefrom.

When the Camp Carson account became a possibility, in the accomplishment thereof both plaintiff and the representative of defendant, as the evidence indicated, bent every effort to that end. When success crowned their united efforts, both parties were concerned with the problem of handling the account, and they talked it over. Plaintiff testified that Karl Walter, manager of defendant, said, "It is too big an account for you to handle up there. We will deliver the beer and carry that account ourselves and pay you your profits." Walter denied that he so stated, but his version of the matter was not convincing to the jury, as the verdict, and judgment of the trial court make manifest.

4. Did the court err in denying the motion for a change of venue? We think not. Plaintiff was a resident of El Paso, and defendant of Pueblo, county, where service was had. Defendant contends that the transfer of the beer at the brewery in Pueblo to Hoder was an out and out sale in the county of Pueblo; that it was sold there and delivered there, with no agreement to pay the profits at any particular place. It cites the Colorado case of *Maxwell-Chamberlain Motor Co. v. Piatt*, 65 Colo. 140, 173 Pac. 867, which would be in point if the premises were as here. In that case a Denver motor concern entered into a written agreement with Piatt of Mesa county, agreeing to sell to him in Denver, and to deliver to him in Denver, motorcars for resale without Denver. The entire contractual obligation was completed in Denver, defendant's residence. The motorcars were delivered there, received there, and paid for there. Nothing remained to be done. But the claim here, involves the deliveries by defendant to Camp Carson as per the modified contract. Sales made pursuant to the original contract, and wherein delivery was made in Pueblo, are not involved in this inquiry. According to Hoder, to reemphasize the point, Karl Walter told him: "It [the Camp Carson account] is too big an account for you to handle up there. We will deliver the beer from

here and carry the account ourselves and pay you your profits." This was disputed by Walter, as heretofore mentioned, but the jury believed he was mistaken. In any event the beer destined for Camp Carson was not delivered, received or paid for by Hoder in Pueblo. There is no testimony as to where Hoder's profits were to be paid. This circumstance—contract silent as to place of performance—has been considered by us before. "Where the contract is silent as to the place of payment, the debtor is obliged to seek the creditor in the county of his residence and at his usual place of business or abode, and make payment to him there." *Progressive Mutual Ins. Co. v. Mihoover,* 87 Colo. 64, 284 Pac. 1025. "The contract is silent as to the place of performance. Defendant made an affidavit in support of the change and the plaintiff filed a counter-affidavit. There was an irreconcilable conflict therein as to the place of performance of the contract, the defendant's affidavit tending to show that it was to be performed in Otero county where he lived, and plaintiff's affidavit that it was to be performed in the city and county of Denver where plaintiff resided. The court was justified in finding that there was no special or any agreement as to the place of performance and only the time of payment was fixed. That being so, payment of plaintiff's commission should be made at Denver where plaintiff resides." *Chutkow v. Wagman Co.,* 80 Colo. 11, 248 Pac. 1014.

█ 5. We come now to the question, Was the jury's verdict excessive? Defendant contends that it was. There is no dispute as to the amount of beer sold, delivered and received at Camp Carson from the brewery; likewise there is no dispute as to the amount of gross profits thereon. The beer was delivered at different times and in different forms: in bottles, half barrels and full barrels. The mathematical calculations of the jury in arriving at the damages appear to be correct, and they were approved by the trial court. During the existence of the contract, the brewery delivered to Camp

Carson, 13,832 cases of 12 oz. pints; 3,208 half barrels; and 237 whole barrels. The gross profit came to $.47 per case on the 12 oz. bottles; $2.00 on each half barrel; and $4.00 on each whole barrel. The net profits were $.44; $1.80; and $3.60, respectively. Hoder testified as to the matter of delivery costs from the brewery to Camp Carson, based on what it would have cost him had he made his own deliveries. Defendant offered no evidence concerning the amount of the profits. It is assumed that the jury multiplied the number of cases, half barrels and whole barrels by the net profits on each, and added the interest. There was no objection to the court's instruction No. 5, which had to do with the measure of damages, and seemingly was drawn on the theory shown by the evidence. It reads as follows: "You are instructed that if you find the issues herein in favor of the plaintiff you shall fix the amount of plaintiff's damages in a sum equal to the profits, if any, Abbot & Hall, or the plaintiff, would have derived from the sale of Walter's beer to the Post Exchanges at Camp Carson as distributor, but in no event to exceed the sum of $0.44 per case on 13,832 cases of 12 oz. pints of beer, $1.80 per half-barrel on 3,208 half-barrels of beer, and $3.60 per barrel on 237 full barrels of beer, together with interest on the total sum at six per cent (6%) from the 19th day of September, 1944, to this date." In *Karsten v. Root,* 40 S. Dak. 236, 167 N.W. 147, plaintiff brought suit on account, and defendant counterclaimed for damages arising from a breach of contract by which defendant was to have the exclusive rights to sell pianos within a certain territory and to receive commissions on such sales. The South Dakota court said: "Respondent testified that the average commission per piano was $50. Appellant offered no evidence tending to contradict this evidence. There is no evidence in the record that any sums of money, under the terms of the contract, would have been expended, other than what had already been incurred and expended by respondent that would have cut down the

amount of the commissions so testified to by respondent. The court only instructed the jury as to the commissions or profits, and said nothing in relation to expenses. The expenses shown by the evidence having been incurred and paid prior to this suit became immaterial so far as the commissions were concerned, as under such circumstances respondent was entitled to the gross commissions. If there were any other expenses, the burden was on appellant to show them, and, none having been shown, it must be presumed on appeal that there were none other than those testified to by respondent." We believe the Dakota case is in point, and the doctrine announced by it appears to be sound. Defendant, although evidently in position to know what expense was incurred in making the Camp Carson deliveries, refrained from offering evidence in that regard. By such refrenation, as we are persuaded, the issue as to the sum of the expense involved therein was determinable on the basis of the showing made by plaintiff, which the jury adopted.

Other points specified by defendant are believed to be without merit. Let the judgment be affirmed.