CITY AND COUNTY OF DENVER, a municipal corporation of the State of Colorado; City and County of Denver Department of Revenue; Patricia Schwartzberg, in her capacity as Manager of Revenue; the City Council of the City and County of Denver and its members, in their capacities as Council persons; and The Honorable Wellington Webb, in his capacity as Mayor of the City and County of Denver, Petitioners,

v.

FEY CONCERT COMPANY, a Colorado General Partnership, Respondent.

No. 96SC798.

Supreme Court of Colorado,
En Banc.

June 8, 1998.

As Modified on Denial of Rehearing
June 29, 1998.

Daniel E. Muse, City Attorney, City and County of Denver Maria Kayser, Assistant City Attorney Denver, for Petitioners.

Law Offices of T. Michael Carrington, P.C. Lynn C. Greene, T. Michael Carrington, Denver, for Respondent.

Justice BENDER delivered the Opinion of the Court.

This case concerns a protest by the respondent, Fey Concert Company ("Fey"), to an assessment by the Department of Revenue for Denver facilities development admissions tax ("seat tax") on tickets for a series of concerts that Fey promoted under a joint venture with the Denver Zoological Foundation ("Foundation"), an agent of the City and County of Denver ("Denver"). The court of appeals held that the party selling tickets to the concerts—the joint venture—was an agent of the Foundation, and that the concert series was therefore exempt from the seat tax pursuant to section 53-347 of the Denver Revised Municipal Code, which exempts sales by the city or a department of the city from the seat tax regulation. *See Fey Concert Co. v. City & County of Denver*, 940 P.2d 972, 977 (Colo.App.1996). We hold that the concert series is not eligible for this tax exemption because an agency relationship did not exist between the Foundation and the joint venture, and therefore the tickets were not sold by an agent of Denver. Accordingly, we reverse the decision of the court of appeals.

## I.

The Foundation is a nonprofit municipal corporation and an agent of Denver. It manages, controls, and administers the Denver Zoological Gardens ("Zoo"), which is owned by Denver. Every summer, the Foundation promotes and produces "Zoofest," a series of concerts held on the grounds of the Zoo.

Because admission to entertainment at any facility owned by Denver, such as the Zoo, is a taxable privilege, *see* D.R.M.C. § 53-342, the Denver Revised Municipal Code requires

anyone who sells tickets to such an event to collect a seat tax in the amount of ten percent of the price of each admission and to remit these taxes to the Denver Department of Revenue.[1] *See id.;* D.R.M.C. § 53-346(b); D.R.M.C. § 53-348(e). The ticket must display the amount of the tax, separate from the sale price. *See* D.R.M.C. § 53-348(c). The party selling the tickets is liable to the city for the amount of the tax even if the seller fails to collect the tax from the purchaser of the ticket. *See* D.R.M.C. § 53-348(c), (d).

Zoofest would normally be subject to the seat tax because a fee is charged for admission and because it takes place at the Zoo, a facility owned by Denver. However, the Code contains various exceptions to the seat tax. One of these exceptions provides that "all sales to or by the city or any department thereof" are exempt from the seat tax. D.R.M.C. § 53-347(3). Until 1993, Zoofest was organized by the Foundation, an agent of Denver. Thus, until 1993 Zoofest fell within the exception for "sales to or by the city" and was exempt from the seat tax.

In 1993, the Foundation and Fey entered into a co-promotional agreement creating a joint venture that would "co-promote the 8th annual Zoofest Concert Series with shared expenses, liabilities, and income." The agreement stated that Fey was an independent contractor of the Foundation rather than an employee, and allocated thirty percent of the profits and losses to the Foundation and seventy percent to Fey.

The co-promotional agreement delineated the duties of each party. The Foundation was to make available a portion of the Zoo premises, restrooms, parking lots, and like facilities. The Foundation reserved the right to approve talent, to control and manage the Zoo, and to enforce the rules of the Zoo. Fey's duties included booking talent, handling ticket sales and distribution, "mak[ing] all decisions concerning the actual operation and production of the Event, which are Fey's expertise and not the expertise of the Zoo,"

---

1. D.R.M.C. § 53-345 defines "admission" as "the right to an entrance ... to any entertainment, amusement, athletic event, exhibition or other production or assembly staged, produced, convened or held at or on any facility or property owned or leased by the city." Section 53-345 defines "vendor" as "a person making a sale to a purchaser of the taxable privilege of admission."

and acting "as the joint venture's representative in paying all expenses associated with the production of each Event" including "all taxes, excise or license fees of whatever nature applicable to this joint venture." [2]

During the course of the summer, Fey contacted officials at the Denver Department of Revenue twice to inquire whether this new arrangement would affect the exemption from the seat tax previously enjoyed by Zoofest. Both times, the officials responded that Zoofest would no longer be eligible for the exception and instructed Fey to collect and remit the seat tax.[3] Nonetheless, Fey failed to collect the seat tax on any of the tickets sold for the 1993 Zoofest concert series and failed to remit seat taxes to the Denver Department of Revenue. As a result, the Department issued a "Notice of Final Determination, Assessment, and Demand for Payment" informing Fey that it owed $36,362 in taxes and additional amounts in penalties and interest.

Fey petitioned the Manager of Revenue for cancellation of the assessment pursuant to section 53-361(c) of the Denver Revised Municipal Code, arguing that Zoofest was exempt from the seat tax because the Foundation, an agent of Denver, was exempt under the exception for "all sales to or by the city or any department thereof," and Fey was a mere agent of the Foundation.

After a hearing, an ALJ held that Fey was not exempt from the seat tax, reasoning that the joint venture could not be characterized as "the city or a department thereof." The ALJ found:

**2.** Taxes and fees were to be paid out of ticket proceeds. If the ticket proceeds were insufficient to cover these costs, Fey was to assess each party its share of the losses with the Foundation paying thirty percent and Fey paying seventy percent.

**3.** Fey first contacted the Denver Department of Revenue before reaching a final agreement with the Foundation. On that occasion, Fey presented the Department with a draft of the proposed agreement between Fey and the Foundation. This draft was not structured as a joint venture but as a contract in which the Foundation retained the services of Fey. The record reflects that the Department suggested to Fey that the formation of a joint venture might permit Fey to avoid collecting seat taxes. Although Fey

The seller of those admissions was the joint venture—a partnership for a limited purpose—made up of the Foundation and Fey. This partnership cannot be characterized as "the city or a department thereof." Thus, the exemption in D.R.M.C. § 53-347(3) is not applicable.

. . . .

It is irrelevant that the admission sales were not subject to FDA tax during the years when the Foundation was solely responsible for the Zoofest concert series. In those years, the admissions sales were made by a City department, and so were subject to the exemption in D.R.M.C. § 53-347(3). The character of the seller changed when the Foundation and Fey entered into the joint venture agreement, and the exemption became inapplicable.

Notwithstanding the agreement, Fey argued at the hearing that it was a mere agent of Denver. However, by entering into the agreement, the Foundation and Fey established a joint venture. Under the agreement, the Foundation and Fey were partners in a partnership formed for a limited purpose. As such, each partner was both a principal and an agent with regard to the other partner. Accordingly, Fey cannot claim that it was solely an agent of the Foundation, because it was equally the principal of the Foundation, just as the Foundation was both the agent and the principal of Fey.

(Citations omitted.) Fey appealed this administrative decision to the district court pursuant to C.R.C.P. 106(a)(4),[4] arguing that the

amended the contract so that the final agreement created a joint venture, the Department determined that the creation of the joint venture did not exempt Zoofest from the seat tax.

**4.** C.R.C.P. 106(a)(4) provides in pertinent part:

Where any governmental body or officer or any lower judicial body exercising judicial or quasi-judicial functions has exceeded its jurisdiction or abused its discretion, and there is no plain, speedy and adequate remedy otherwise provided by law:

(I) Review shall be limited to a determination of whether the body or officer has exceeded its jurisdiction or abused its discretion, based on the evidence in the record before the defendant body or officer.

joint venture sold the tickets and that the joint venture was exempt from the seat tax because the joint venture was the agent of the Foundation, which in turn was the agent of Denver. The district court ruled that the ALJ did not exceed her jurisdiction or abuse her discretion by concluding that the 1993 Zoofest concert series was not exempt from the seat tax. The district court agreed with Fey that the joint venture sold the tickets but determined that an agency relationship did not exist between the joint venture and the Foundation.

The court of appeals reversed, holding that the ALJ abused her discretion by misconstruing the language of the joint venture agreement. *See Fey Concert,* 940 P.2d at 977. The court of appeals acknowledged that "[b]y virtue of the general law of partnership, both parties had an equal right to control the joint venture." However, the court of appeals determined that under the co-promotional agreement, the parties intended the Foundation to exercise dominant control over Zoofest and to delegate "a limited range" of functions to Fey. *Id.* at 976. Based on this allocation of duties, the court of appeals determined that the joint venture was the agent of the Foundation and that Fey was a subagent of the Foundation. The court of appeals held that "because the Foundation, i.e., the principal of the joint venture, was exempt, so too were its agent (the joint venture) and its subagent (Fey)." *Id.* at 977.

The court of appeals also held that the ALJ abused her discretion by "misappl[ying] the relevant legal standards in reaching her decision" because the ALJ should have determined the applicability of the seat tax exception by determining the owner of the site for Zoofest. *Id.* The court of appeals relied upon *City & County of Denver v. Board of Assessment Appeals,* 782 P.2d 817, 821 (Colo. App.1989), a case involving property taxes, for the proposition that " '[t]he fundamental question for tax exemption purposes must be decided on the basis of real ownership.' "

*Fey Concert,* 940 P.2d at 977 (quoting *City & County of Denver,* 782 P.2d at 821). The court of appeals concluded that because the Zoo was owned by Denver—which was exempt from the seat tax—the events at the Zoo were similarly exempt from the seat tax.

Denver then petitioned this court for certiorari review of the decision of the court of appeals.[5]

## II.

The parties agree that the exemption from the seat tax requirement applies if the party charging admission to the event is an agent of Denver or a subagent of Denver via the Foundation. The Foundation argues that the joint venture sold the tickets and that the joint venture is not an agent or a subagent of Denver. Fey argues that the joint venture was responsible for selling the tickets but that it did so only in its capacity as an agent of the Foundation and that the Foundation and not the joint venture should be considered the "vendor" for purposes of the seat tax exemption. Hence, the question presented for the resolution of this appeal is whether the joint venture was an agent or a subagent of Denver. The ALJ held that the joint venture was not an agent or a subagent of Denver. Our review of this decision is limited to a determination of whether the ALJ exceeded her jurisdiction or abused her discretion under C.R.C.P. 106(a)(4).

We begin with a discussion of the law of agency. An agency is a "fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Harold Gill Reuschlein & William A. Gregory, *The Law of Agency and Partnership* § 2, at 4 (2d ed.1990); *see also Stortroen v. Beneficial Fin. Co.,* 736 P.2d 391, 395 (Colo.1987). This consensual arrangement may, but need not, amount to a

5.  The issues as framed on certiorari are:
    1.  Whether the court of appeals erred in holding that a joint venture agreement between Fey and the Denver Zoological Foundation to promote a concert series made the joint venture an agent of the Foundation.

2.  Whether the court erred by ruling that the tickets sold to the concerts were not subject to the Denver seat tax.

contract. *See Stortroen*, 736 P.2d at 395. "What is critical is that the parties materially agree to enter into a particular relation to which the law attaches the legal consequences of agency...." *Id.* The existence of an agency relationship is usually a question of fact, however, we may properly decide the question as one of law when, as here, the facts are not in dispute. *See id.* One type of agency relationship is a joint venture, which is an association of two or more persons formed for the purpose of carrying out a particular business enterprise for profit. *See* Reuschlein & Gregory, *supra*, § 266, at 451; *Hooper v. Yoder*, 737 P.2d 852, 861 n. 4 (Colo.1987). Each partner in a joint venture is an agent of the other partners with respect to the joint venture. *See Ball v. Carlson*, 641 P.2d 303, 305 (Colo.App.1981).

■ Applying these principles to the facts of this case, the agreement created a joint venture in which the Foundation and Fey were partners. Hence, the ALJ correctly determined that the Foundation was an agent of Fey and Fey was an agent of the Foundation. No facts in the record suggest the existence of an agency agreement between the Foundation and the joint venture. The record discloses no evidence of a mutual agreement, explicit or implicit, between the Foundation and the joint venture to enter into an agency relationship. Thus, the ALJ's findings of fact support her conclusion that the joint venture was not an agent or a subagent of Denver. Because Zoofest tickets were not sold by an agent of Denver, but were sold by the joint venture, the ALJ did not abuse her discretion in holding that the Zoofest concert series was subject to the seat tax.

The court of appeals reasoned that the Foundation was the "dominant" partner in the joint venture and that this allocation of duties in the joint venture contract rendered Fey an agent of the Foundation. We disagree with the court of appeals' characterization of the Foundation as the "dominant" partner. Under the agreement, seventy percent of the profits and losses were allocated to Fey, and Fey possessed the authority to "make all decisions concerning the actual operation and production of the Event." In addition, the agreement stated that Fey was an independent contractor of the Foundation rather than an employee. "A true independent contractor is the very antithesis of a servant." Reuschlein & Gregory, *supra*, § 2, at 5. The ALJ found no facts to support a conclusion that the Foundation and the joint venture manifested a mutual intent to enter into an agency agreement. *See Stortroen*, 736 P.2d at 395. Because the ALJ's findings of fact do not support the court of appeals' conclusion that the Foundation and the joint venture entered into an agency relationship providing for control and operation of the Zoofest concert series to be exercised by Denver or its agent, the Foundation, we hold that the ALJ did not abuse her discretion when she concluded that the joint venture was not a subagent of Denver. Thus, we reverse the judgment of the court of appeals.

### III.

In summary, we hold that the Zoofest concert series is not eligible for exemption from the Denver seat tax because the seller of tickets to the concert series was the joint venture, which neither acted on behalf of Denver nor was controlled by Denver. We therefore reverse the judgment of the court of appeals and remand this case to the court of appeals with directions to reinstate the judgment of the district court requiring the joint venture to pay the seat tax.

SCOTT, J., specially concurs.

Justice SCOTT specially concurring:

I join in the judgment of the majority. However, I do not join in its opinion holding that the "concert series is not eligible for [the] tax exemption because an agency relationship did not exist between the Foundation and the joint venture...." Maj. op. at 658. In my view, the majority incorrectly assumes the concert series or joint venture, and not a purchaser of admission, is subject to the admissions tax at issue. Moreover, I believe this incorrect assumption is further aggravated by the majority's reliance on the lack of an agency relationship in reaching its result. Together, in this manner, the majority fails to apply the controlling ordinance

and, in its analysis, unnecessarily exalts form over substance to resolve the question before us.

## I.

The form of the joint venture is material and controls the result under my analysis, however, because I would not conclude the existence of an agency relationship by itself to be determinative, I write separately. In doing so, I look to the tax ordinance and the essence of the joint venture relationship, that is, control and economic participation, thereby making reliance upon standards of agency law unnecessary. Accordingly, while I join the judgment of the majority, I do not subscribe to the rationale it has adopted.

## II.

First and foremost, this is a tax case. Therefore, in my view, this case must turn upon the provisions of the Denver Revised Municipal Code (D.R.M.C.) adopted by the taxing authority, the Denver City Council.

## A.

The purpose and nature of the Denver facilities development admissions tax is prescribed in Article VII of the D.R.M.C. D.R.M.C. section 53–343 provides that the purpose of the facilities development admissions tax "is for the payment of expenses in acquiring, constructing, installing, maintaining, repairing, operating or improving facilities of the city." *Id.* The tax is directly imposed on "every person who purchases an admission" ticket, and not concert promoters. D.R.M.C. §§ 53–342(a); 53–346(a). The "amount of the tax is ten (10) percentum of the price of each admission,"[1] which is then added to the cost of the ticket. D.R.M.C. § 55–346(b), § 55–348(c), (d). The vendor, "as trustee for and on account of the city, is required at the time of making such sale to collect the tax imposed" from "the purchaser." D.R.M.C. § 55–348(a). The tax is a

"debt from the purchaser to the vendor until paid." D.R.M.C. § 53–348(c). In the event the purchaser of an admission fails to pay the tax, it may be recovered by the vendor "in the same manner as other debts." Nonetheless, "the vendor, who, as trustee for and on account of the city, shall be liable to the city for the collection" of such taxes owed by purchasers. D.R.M.C. §§ 53–348(c); 53–348(d).

## B.

Prior to May 1993, the Denver Zoological Foundation (Foundation) and Fey Concert Company (Fey) agreed to co-promote "a series of concerts for Summer 1993 to be known as 'Zoofest.'" The "verbal agreement" was reduced to writing by the execution of the "Denver Zoological Foundation Co-promotional Agreement For Fey Concert Company/Zoofest Concerts" (Co-promotional Agreement) with a May 1, 1993, effective date for concerts during June, July, and August of the same year. Under the terms of the Co-promotional Agreement, Fey and the Foundation organized a joint venture (Zoofest Joint Venture). Under section 1.3 of the Co-promotional Agreement, the Zoofest Joint Venture was initially capitalized by a single $28,000 contribution made by Fey as an advance to the Foundation against the Foundation's future share of any profits of the enterprise. Thus, under its terms, while Fey placed capital at risk, before the Foundation was paid any share of profits, Fey would be reimbursed for the initial capital contribution. Presumably, to make clear the relationship was not one of employment between the Zoofest Joint Venture and its participants (Foundation or Fey), the agreement also provided: "No party is entitled to a salary."

As discussed further below, Fey was entitled to 70% of all profits and losses and the Foundation was to receive, after payment of the $28,000 advance made by Fey, 30% of

---

1. An "admission" is defined in section 53–345(1) as:

the right to an entrance and an occupancy of a seat or an entrance alone, of a person who, for a consideration ... uses, possesses or has the right to use or possess entrance and occupancy of a seat or an entrance alone to any entertainment, amusement, athletic event, exhibition or other production or assembly staged, produced, convened or held at or on any facility or property owned or leased by the city....

any profits and would be allocated 30% of any losses. The duties and responsibilities of each party to the Zoofest Joint Venture were further set forth in the Co-promotional Agreement, a thirteen-page document. Section 1.4, consisting of pages two through eight, set forth Fey's "duties [and] obligations on behalf of the Zoofest co-promotional joint venture." Fey was responsible for "production of the Zoofest and each Event," [2] "to act as the joint venture's representative in ... the production of each event," [3] and, among other things, "make all decisions concerning the actual operation and production" of Zoofest.[4] The Foundation's duties are located in Section 1.5 and are designed, generally, to facilitate Fey's activities, including Fey's exclusive right outside the Zoofest Joint Venture to "sell novelties, merchandise, programs, etc., and to retain all of the proceeds therefrom...." [5]

### C.

The majority holds that "the concert series is not eligible for [the] tax exemption [for sales by the city or a department of the city] because an agency relationship did not exist between the Foundation and the joint venture...." Maj. op. at 658. In my view, however, it is not the joint venture or the "concert series" that is subject to any admission tax and therefore eligible for exemption from that tax. Hence, it is not the concert series, the Zoofest Joint Venture, Fey, or the Foundation that is being taxed, but rather, the audience or purchasers of admission to Zoofest who are subject to the tax. The joint venture created by the "Denver Zoological Foundation Co-promotional Agreement For Fey Concert Company, Zoofest Concerts" between Fey and the Foundation, is merely obligated as "vendor to collect the tax from the purchasers on behalf of the City of Denver." D.R.M.C. § 53–348(a). Thus, agency law does not resolve the tax dispute here.

2. § 1.4.1, Co-promotional Agreement.

3. § 1.4.2, Co-promotional Agreement.

4. § 1.4.4, Co-promotional Agreement.

5. § 1.5.6, Co-promotional Agreement.

What is in dispute is whether the joint venture's promotion of the Zoofest concert series is tantamount to the sale of admission by the city. To resolve that question, I look to the terms and conditions of the Co-promotional Agreement to determine whether the city government is sponsoring the Zoofest concert series. Examining, then, the Co-promotional Agreement and applying the city's tax ordinance, I agree that the Zoofest Joint Venture, as promoter and vendor of the concert series,[6] is liable for the tax it failed to collect from purchasers of admission. I reach this result not because of agency law principles, but in light of the plain legal fact that the exemption from the admissions tax is generally available only to a purchaser from the government. D.R.M.C. § 53–347(3).

### III.

### A.

D.R.M.C. section 55–347 provides an exemption from the admissions tax to "All sales to or by the United States government or the state, its departments or institutions, and the political subdivisions thereof, in their governmental capacities only; *and all sales to or by the city or any department thereof*[.]" *Id.* (emphasis added). Because there is no dispute that the Zoofest concert series did not result in a sale of admission "to ... the city," we must next determine whether the joint venture's sale of admissions was, in effect, a "sales ... by the city or any department thereof." In other words, only if the vendor in its capacity is equivalent to "the city or any department thereof," does the vendor qualify for the exemption. Therefore, the principal issue here is not whether the joint venture is an agent of the Foundation, but rather, whether the co-promotional activities of the joint venture constitute actions of "the city or any department thereof."

6. In its Decision and Order, the administrative law judge found that "The concerts were held at the zoo facility. The concerts were advertised as 'Budweiser Summer of Stars '93 Zoofest Concert Series Proudly Presented by the Denver Post.'"

After examining the terms and conditions of the joint venture as set forth in the Co-promotional Agreement between Fey and the Foundation, I conclude that the joint venture in its conduct of the Zoofest concert series was not the equivalent to "the city or any department thereof." My conclusion is supported by several factors, including the fact that: (1) Fey was in control of the joint venture, and (2) Fey was to share in 70% of the profits.

In Section 1.2, the Co-promotional Agreement set forth an allocation of profits and losses of 30% to the·Foundation and 70% to Fey. Section 1.4.1 provided that Fey was responsible for the:

> production of the Zoofest and each Event, negotiation and making arrangements with vendors for any goods and services needed to produce each event (including, but not limited to the providing of police and security, talent transportation to and from their hotel and the Event site, medical, ASCAP/BMI and other related fees), setting up and dismantling of the Event site, arranging for the sale of novelties-both Event and talent (artist), and arranging for ticket sales and distribution. . . .

Under Section 1.4.2, almost all expenses of the series were joint venture expenses, which Fey was responsible for, except for a limited number of items which the zoo agreed to absorb. Thus, clearly, Fey was the principal benefactor of the joint venture's promotional activities, not the Foundation and indirectly, the city.

Moreover, Fey was the manager or controlling partner in the joint venture. Fey, not the Foundation, was obligated to obtain, book, and contract all talent, which would be subject to the reasonable approval by the Zoo. § 1.4.3. Section 1.4.4 provided that Fey was in control of "mak[ing] all decisions concerning the actual operation and production of the Event, which are FEY'S expertise and not the expertise of the Zoo." Fey was also obligated to obtain liability insurance for its own negligence during the event and named the City as an additional insured. § 1.4.7.

## B.

The Foundation also had duties specified in the joint venture agreement. Many of these duties, however, merely delegated authority to help Fey promote the concert series. For instance, section 1.5.1·stated that the Zoo was obligated "to allow and make available a portion of the Zoo facility, as hereinafter set forth, for the production and promotion a series of concerts, to be titled 'Zoofest'. . . ." Section 1.5.2 specified exactly which portion of the Zoo facility Fey would be allowed to use. Section 1.5.6 stated that the Zoo would "grant to Fey the right to sell novelties, merchandise, programs, etc. and to retain all (100%) of the proceeds therefrom. . . ." Under section 1.5.8, the Zoo was obligated to furnish to Fey "at no extra charge to the Zoofest co-promotional joint venture, the following services as may be required for the use of said Zoo facility for said purpose: General house lighting, general stage lighting, one mobile parking lot security officer, and open and clean restrooms at the entrance and cafeteria plaza, and janitorial services before and following each Event."

From the foregoing, it is evident that Fey was the dominant party in the joint venture, controlling all aspects of the Zoofest. concert series for private benefit, entitled to 70% of the profits, as well as public good (to. benefit the foundation).[7] An examination of the dis-

---

7. The concerts were profitable and Fey and the Foundation split the "net profits" with "Fey's net profits [at] $76,628, and the Foundation's net profits [at] $32,840," as found by the administrative law judge. However, that computation does not reflect the deduction of the $28,000 to be paid to Fey for the advance charged against the Foundation and made in accordance with section 1.3 of the Co-promotional Agreement.

The dissenting opinion states: "Under the majority's holding that the joint venture is liable for the uncollected tax, the [Foundation's] profits drop from $32,840 to $19,735 when the seat tax is included as an expense, for a total reduction of $13,105. Fey's profits drop from $76,628 to $46,049, for a total reduction of $30,579." Dis. op. at 19. This suggests that under the terms of the Co-promotional .Agreement that: (1) the Foundation would not fully benefit from the joint venture if the taxes imposed by law are collected from purchasers, or (2) the Foundation's share of net profits will suffer and is reduced by the admissions tax.

That suggestion, however, is simply incorrect. Nowhere is it stated here or in the majority opinion that the Foundation is to be taxed, or

tribution of profits is important because it is doubtful that the City Council intended a scenario whereby a private party, entitled to the bulk of the profits, could qualify for a tax exemption applicable only to government entities. It follows, therefore, that because the joint venture, in its capacity as promoter of the concert series, was not "the city or any department thereof," its arguments today must fail.

Accordingly, I agree with the majority that the tax exemption is not applicable to purchasers of admission to the Zoofest concert series and, hence, the joint venture is "required at the time of making such sale [of admission] to collect the tax imposed" on behalf of the City.

### C.

The district court observed:

> There is little doubt that if the Foundation completed 100 percent of the tasks involved in putting together the concert series that ticket sales would have been exempt from the FDA tax. There is also little doubt that the FDA tax would apply if the joint venture or Fey completed 100 percent of the tasks involved in putting together the concert series and simply used the Zoo facility as a venue. Somewhere in the middle of those two extremes the Zoofest concert series stopped being the Foundation's concert series and became a concert series produced and run by the joint venture and/or Fey. At that point, the Zoofest tickets were no longer sold "to or by the city or any department thereof."

The district court's observation is correct. Whether or not the joint venture is an agency of the Foundation, the principal issue upon which the majority and dissenting opinions turn, is not, in my view, controlling.

that it would be liable for the penalty, or that its profits need be reduced: The tax at issue here is imposed on purchasers of admission and is to be added to ticket prices. Therefore, when properly added to the price of tickets and collected by a vendor as required by ordinance, there is no basis to assume a tax would make the joint venture and its participants' net profits any less than set forth in the record—except, of course, to the extent of any liability of the joint venture for the failure to collect the admissions tax.

Because the exemption for purchasers itself turns on whether the sales are "by the city," the substance and not the form of the joint venture enterprise should control, whether or not the concert series is the Foundation's or Fey's. And to resolve this issue, in my view, an examination of which party has the power to control the joint venture and collect a greater share of its profits is determinative.

Where, as here, a private person obtains a position of control, financially and administratively, of an independent enterprise, the hallmarks of government fail to exist. And, therefore, any benefit dependent upon government status should not be acknowledged.

The majority's analysis utilizing agency principles, therefore, does not extend far enough to reach the substance of the transactions (involving purchases of admission) to resolve the issue presented here. The majority holds that "the concert series is not eligible for [the] tax exemption [for sales by the city or a department of the city] because an agency relationship did not exist between the Foundation and the joint venture...." Maj. op. at 658. For future concerts, therefore, if the joint venture agreement is amended to provide a clause declaring that for all purposes, Fey or the joint venture has entered into an agency relationship with the Foundation, the majority's objection is answered without any substantive change to the Co-promotional Agreement. I do not believe this mere change in form alone should be determinative of the issue before us. Therefore, without an examination of which party in particular had control of the operation and was entitled to the economic benefits of the profits, we cannot resolve whether the joint venture was acting as "the city or any department thereof."

Finally, even if Fey is not only an agent of the joint venture, but also an agent of the Foundation, the result here is not harsh or unanticipated by the parties; principals are bound by the acts of their agents and may be held accountable for any unlawful or inappropriate agent conduct. Cf. Montoya v. Grease Monkey Holding Corp., 883 P.2d 486, 488 (Colo.App.1994).

## IV.

I would conclude that because admission to the concert series was not sold in transactions "to or by the city or any department thereof," D.R.M.C. § 53-347(3), the claimed tax exemption is not available to purchasers of admission tickets. Hence, the joint venture was "required to collect the tax ... from the purchaser[s]," D.R.M.C. § 53-348(a), and because it failed to do so, it is liable to the city, as a penalty, for the amount of tax it did not collect plus 10% of said amount, and interest, D.R.M.C. § 53-358(a).

Accordingly, while I join in the judgment of the majority and agree that the judgment of the court of appeals must be reversed, I cannot join in its reasoning and its opinion.

SCOTT, J., specially concurs.

HOBBS, J., dissents, and MARTINEZ, J., joins in the dissent.

Justice HOBBS, dissenting:

I respectfully dissent. The Denver Revised Municipal Code levies a seat tax on anyone who sells tickets to an event held at a city-owned facility, see D.R.M.C. § 53-342, but exempts "all sales to or by the city or any department thereof." D.R.M.C. § 53-347(3). I conclude that Fey Concert Company (Fey) acted as the Zoo's agent in promoting the Zoofest concert series. In carrying out its duties, Fey at all times acted on behalf of the Zoo, for the Zoo's benefit, and subject to the Zoo's ultimate control. Accordingly, for purposes of assessing the seat tax, Fey falls within the exemption covering "all sales to or by the city or any department thereof."

Contrary to the majority's conclusion that no evidence supports an agency relationship between the Zoo and the joint venture, see Maj. op. at 661, the record in this case reveals an unbroken chain of agency from the city to the Zoo to Fey.

## A.

### The ALJ Made an Erroneous Legal Conclusion and Abused Her Discretion

It is uncontroverted that the Denver Zoological Foundation (Zoo) is an agent of the city. The city's agreement with the Zoo so provides: "The city hereby employs the Foundation *as its agent* to manage, control, administer and be in charge of the zoo." (Emphasis added.) It is also undisputed that, as an agent of the city, the Zoo qualifies as "the city or any department thereof." The record as a whole shows that Fey, viewed either alone or as part of a joint venture between the Zoo and Fey, acted as an agent of the Zoo in promoting Zoofest.

The majority concludes that no evidence supports the existence of an agency relationship because, "The ALJ found no facts to support a conclusion that the Foundation and the joint venture manifested a mutual intent to enter into an agency agreement." Maj. op. at 661. However, the ALJ found "no facts" because she failed to make findings of fact pertinent to the existence of an agency relationship, and she misapplied the law of agency. Her legal conclusion that no agency relationship existed was based on an erroneous view that the existence of a joint venture precluded Fey's claim of agency:

> Notwithstanding the agreement, Fey argued at the hearing that it was a mere agent of Denver. However, by entering into the agreement, the Foundation and Fey established a joint venture.... Under the agreement, the Foundation and Fey were partners in a partnership formed for a limited purpose.... As such, *each* partner was both an [sic] principal and an agent with regard to the other partner.... Accordingly, Fey cannot claim that it was solely an agent of the Foundation, because it was equally the principal of the Foundation, just as the Foundation was both the agent and the principal of Fey.

(Emphasis in original.)

In reviewing a decision under C.R.C.P. 106(a)(4), we must determine whether the governmental body or officer applied an erroneous legal standard. *See City of Colorado Springs v. Givan,* 897 P.2d 753 (Colo.1995). In turn, the standard we employ in our review under the rule is whether "any governmental body or officer or any lower judicial body exercising judicial or quasi-judicial

functions has exceeded its jurisdiction or abused its discretion," C.R.C.P. 106(a)(4), and, "[r]eview shall be limited to a determination of whether the body or officer has exceeded its jurisdiction or abused its discretion, based on the evidence in the record before the defendant body or officer," C.R.C.P 106(a)(4)(I).

Contrary to the ALJ's conclusion, the existence of a joint venture does not preclude an agency relationship. A joint venture can be an agent. Although partners in a partnership are both principals and agents with respect to one another, as well as agents of the partnership in transacting partnership business, this does not answer the question of whether an agency relationship was created with respect to the production and promotion of Zoofest. The ALJ's determination that no agency relationship was possible in light of the joint venture constituted an abuse of discretion because she ignored the pertinent evidence, made no findings on an issue in the case, and reached an erroneous legal conclusion.

The majority concedes that the question of agency is primarily a question of fact, whether "the parties materially agree to enter into a particular relation to which the law attaches the legal consequences of agency." Maj. op. at 661 (quoting *Stortroen v. Beneficial Fin. Co.*, 736 P.2d 391, 395 (Colo.1987)). But the ALJ focused too narrowly on the joint venture agreement, which was signed August 25, 1993, *after* most of the concerts had occurred and after many of the facts giving rise to the agency relationship had taken place.

We must base our review on the entire record before the ALJ. *See* C.R.C.P. 106(a)(4)(I) ("Review shall be ... based on the evidence in the record before the defendant body or officer.") The question of whether an agency relationship existed is the critical factor in deciding whether the seat tax applies: an agent selling tickets for a Zoo event, whether an individual, a corporation, or a joint venture of the Zoo, acts for the Zoo—and thus, the city—and cannot be assessed the seat tax. Fey's promotional activities and the joint venture's co-promotional activities were undertaken in an agency capacity and constitute the activities of "the city or any department thereof."

## B.

### *Facts Relevant to the Creation of an Agency Relationship Between the Zoo and Fey*

The record demonstrates that the ticket sales occurred solely for the Zoo in the context of an agency relationship. As revealed by the testimony of witnesses, as well as the joint venture agreement itself, the Zoo intended from the outset to create an agency relationship with Fey to produce and promote its concert series. The joint venture agreement did not supplant the agency relationship but rather was meant to confirm it. "Zoofest" always remained a Zoo event, with Fey acting in a fiduciary relationship to the Zoo and subject to its ultimate control.

In the seven years prior to 1993, the Zoofest concert series had never been subject to the seat tax. In 1993, the Zoo, desiring to continue Zoofest, but wishing to devote less time and realize more income for the Zoo, solicited bids and selected Fey to help it promote the concert series. Thomas Peterson, who served as Marketing Director of the Zoo in 1993 and had promoted Zoofest for the previous seven years, testified that Zoofest was a unique marketing tool for bringing people to the Zoo. Its purpose extended well beyond obtaining additional revenue for the Zoo. It was intended to expose nontraditional audiences to the Zoo, promote interest in the Zoo, enhance the Zoo's reputation in the community, and increase visits and admission revenues throughout the year.[1]

Prior to 1993, the Zoo continued to hold Zoofest even though it lost money on the series three out of seven years. In securing Fey, a professional promoter, to execute many of the responsibilities of producing and

---

1. According to Peterson, the objective of the series was

> to expose different audiences to the zoo, the 25 to 40 without kids. It had added hundreds of thousands of dollars through the summer, in addition to my advertising budget. It had other reasons for being done.

promoting Zoofest, the Zoo was seeking to increase the overall effectiveness of the series for generating revenue, enhancing its reputation, and exposing the Zoo to new patrons who might repeat their visits.

The Zoo retained critical aspects of control over Zoofest, while delegating to Fey responsibilities for implementing the success of the series. Under the parties' original understanding—later confirmed by their joint venture agreement—Fey had the authority to book talent for the concerts, but the talent could be selected only with the Zoo's approval.[2] Fey set the ticket prices, subject to the Zoo's approval. The dates of the concert were set by the Zoo, and the Zoo set the capacity for the concerts. The Zoo had to approve all advertising. At the hearing, Peterson engaged in the following exchange with opposing counsel:

Q: Was there any provision that the zoo would have any kind of restrictive voice for the advertising or control of the concert?

A: *I had to approve everything.*

Q: Before it went out?

A: *Absolutely, including press releases.*

(Emphasis added.) Though promotion was primarily delegated to Fey, Peterson himself did some of the media interviews and promotional work for Zoofest. Any sponsors of the events required Zoo approval. The Zoo also determined how late the concerts would extend, as well as the allowable noise level.

In Peterson's words,

I had management of the venue, *authority for approval of every area of the series.* The only difference was that instead of me making the calls to creative artists, Fey was to do that. Instead of me contracting out for promotion, Fey was going to do that.

(Emphasis added.)

While the agreement between the Zoo and Fey was that the Zoo would retain 30% of the profits from the series, and Fey would receive 70% of the profits, Fey had to manage and maintain on behalf of Zoofest all books and records as to income and expenses. Thus, the Zoo retained authority over nearly all aspects of Zoofest, while Fey carried out most promotional and production functions and handled the books and records of income and expenses. Peterson testified at trial that:

In my opinion, and in the opinion of the Denver Zoo, *Fey was acting as an agent of the Denver Zoo to execute the Zoofest Concert Series* ... it was not the intent of this agreement, or the very first conversation with Barry, *it was never, "We're turning this over to you."* Fey would not have been involved in the Zoofest concert series if the zoo didn't want to have one. *The Denver Zoo was not interested* at that time, or my understanding, from any time from that point on, *[in] allowing the zoo to act as a venue for concerts* ... the zoo would hold it, and that's it.

(Emphasis added.)

Sometime during the planning of Zoofest, Fey raised the subject of the seat tax. Although Fey was operating under the assumption that the seat tax did not apply because of the Zoo's status with the city, Peterson and Michael McKanna (McKanna), Controller for Fey, sought confirmation from the Denver Department of Revenue (Revenue) that the tax would not apply. At that time, tickets were already on sale and had not been priced to include the seat tax. McKanna and Peterson both testified that it was always the intent of the Zoo and Fey to structure their relations in such a way as to be exempt from the seat tax.

McKanna placed a phone call to Don Korte (Korte) at Revenue and inquired about the seat tax. Korte's initial response two weeks later was that Fey would be responsible for paying and collecting the seat tax. McKanna testified that Korte indicated, however, that Revenue would review Fey's contract with the Zoo, and that a joint venture deal or co-promotion would help Fey's case. Peterson also testified that a Revenue official informed

---

**2.** The agreement between the Zoo and Fey provides that the Zoo retains the right to "reasonably approve" all talent. The fact that the Zoo could not "unreasonably" withhold approval does not alter the fact that the Zoo retained the right to control the selection of the talent in order to ensure that it was consistent with the Zoo's mission and public image.

him that a joint venture contract would be helpful in avoiding the seat tax.[3]

According to McKanna, the Zoo and Fey then turned to formalizing their agreement in writing. By the time Fey and the Zoo received formal notification by letter on August 20, 1993, of Revenue's intent to levy the seat tax, nearly all tickets had been sold—priced without the 10% seat tax—and the concert series was finished except for one concert.[4]

On August 25, 1993, Fey and the Zoo signed a joint venture agreement describing the duties and responsibilities of the parties. The contract was made retroactive to May 1, 1993.

### ·C. ·

#### Principles of Agency Law

The law of agency supports a conclusion that Fey and the joint venture were agents of the Zoo, an entity which is exempt from the seat tax. The joint venture agreement did not speak specifically to the issue of agency. Section 2.10, which the majority relies upon, provided the following:

> *Independent Contractor.* Nothing in this Agreement shall be construed nor shall it be construed that FEY is an employee of Zoo nor shall it be construed that FEY is a joint venturer of the Zoo other than for the Zoofest for the Summer of 1993 as provided for herein.

But this contractual provision lends little guidance on the issue of the agency's existence or non-existence, because an independent contractor may or may not be an agent; whether or not the person is an agent depends on the circumstances of the undertak-

ing. *See Restatement (Second) of Agency* § 2 (1958).

In *Stortroen* we determined that the selling broker in a real estate transaction is an agent of the listing broker, and as such is within a chain of agency to the seller. *See Stortroen v. Beneficial Fin. Co.,* 736 P.2d 391, 393 (Colo.1987). Although there was no written contract between the selling broker and the listing broker establishing agency, we held that the basic structure of the relationship made the selling broker an agent of the listing broker and, consequently, a sub-agent of the seller. *See id.* at 399.

Agency is "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Restatement (Second) of Agency* § 1(1). "Agency is ultimately a question of the intention of the parties and is evidenced by their acts and not on what the relationship is called." *Moses v. Diocese of Colorado,* 863 P.2d 310, 324 (Colo. 1993). An agent is generally one who "acts for or, in place of, another, or is entrusted with the business of another." *Id.* The control a principal exercises over the manner of work performed by an agent is evidence of agency. *See id.* No one factor, including control, is determinative, and the most important factor in determining whether a person is an agent is the "right to control, not the fact of control." *Id.*

The essential characteristics of an agency relationship are that (1) the agent holds a power to alter legal relations between the principal and third persons and·between the principal and the agent, *see Restatement (Second) of Agency* § 12; (2) the agent is a fiduciary with respect to matters within the scope of agency,[5] *see id.* § 13; and, (3) the

---

3. Korte, in regard to the conversation about a joint venture, said that he didn't recall the conversation and remembered only that his initial reaction was that the seat tax would be applicable.

4. On July 28, 1993, in the middle of the concert series, Scott Sprague of Revenue did send a separate letter to McKanna stating that the seat tax would apply "unless Fey can demonstrate that any of the criteria for exemption under Section 53–347 of the *Denver Revised Municipal Code* (DRMC) have been met."

5. These fiduciary duties include: the duty to account for profits arising out of the employment, the duty not to act as or on account of an adverse party without the principal's consent, the duty not to compete with the principal on the agent's own account or for another in matters relating to the subject of the agency, and the duty to deal fairly with the principal in all transactions between them. *See Restatement (Second) of Agency* § 13 cmt. a.

principal has the right to control the conduct of the agent with respect to matters entrusted to the agent, *see id.* § 14.

As we explained in *Stortroen,* an agent may further delegate its authority to sub-agents. *See Stortroen,* 736 P.2d at 395. A subagent is "a person appointed by an agent empowered to do so, to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible." *Id.* (quoting *Restatement (Second) of Agency* § 5(1)).

Independent contractors may or may not be agents or subagents: "the attorney-at-law, the broker, the factor, the auctioneer, and other similar persons employed either for a single transaction or for a series of transactions, are agents, although as to their physical activities they are independent contractors." *Restatement (Second) of Agency* § 1 cmt. on subsection (3). The critical factor is that an agent is "a person authorized by another to act on his account and under his control." *Id.*

The authority to perform a particular act may be conferred by specific words of a statement to the agent, by directing an agent to perform acts, or by inference from words or conduct. *See id.* § 26 cmt. c. If the authorization is ambiguous, the interpretation acted upon by the parties controls. *Id.* § 43.

A partnership, such as a joint venture, also may be an agent. *See* Scott Rowley, *Rowley On Partnership* § 9.0 (2d ed.1960). Within a partnership, "each partner is the agent for the other partners and the partnership in the partnership business." *Id.* Thus, a partner has the authority to act both as an agent for the other partners and as an agent for the partnership. Additionally, a partner in a firm is not hindered from engaging in business transactions with the firm in good faith so long as the firm receives a fair consideration for its bargain. *See id.* § 21.1.

### D.

### *The Agency Relationship of the Zoo, Fey, and the Joint Venture*

The question of the existence of an agency relationship is a mixed question of law and fact, and when the facts are undisputed, a reviewing court must decide the question based on legal principles. *See Stortroen,* 736 P.2d at 395. An agency's final order must be set aside by a reviewing court if the agency applied an erroneous legal standard. *See Givan,* 897 P.2d at 756.

In this case, the ALJ reached an erroneous conclusion of law. The ALJ concluded that by entering the joint venture with the Zoo, Fey could no longer claim it was an agent of Denver. The ALJ concluded that because Fey and the Zoo had formed a joint venture, each partner was both a principal and an agent with regard to the other partner, and "[a]ccordingly, Fey cannot claim that it was solely an agent of the Foundation, because it was equally the principal of the Foundation, just as the Foundation was both the agent and the principal of Fey."

The ALJ's determination misapprehends the fundamentals of agency law. Although the ALJ was correct in stating that the partners in a joint venture serve both as principals and agents in conducting partnership business, the partners' duties to one another do not prevent the joint venture from serving as an agent in a transaction between the joint venture and another entity. The existence of a joint venture does not negate an agency relationship, nor does it answer the question whether an agency relationship existed. Rather, the ALJ should have examined the essential factors giving rise to agency: a fiduciary relation; the manifestation of consent by both parties; the agent's authority to act on the principal's behalf; and the principal's right to control. Here, the evidence shows that the parties consented to and intended to enter into an agency relationship from the outset of the relationship and throughout. This is so whether we view Fey as an agent of the Zoo, or the joint venture as an agent of the Zoo.

The record demonstrates that the Zoo engaged Fey as its agent to make successful its own concert series, which was faltering. The Zoo retained control over key aspects of Zoofest, including selection of talent, dates, advertising, and other areas in order to ensure

that the concerts were consistent with the Zoo's mission and goals. The Zoo was not a mere landlord renting out its premises for profit.

It is not important that Fey received 70% of the profits from the joint venture, because it is clear that regardless of the level of Fey's compensation for its services, the concert series was the Zoo's for its sole purpose. The level of compensation presumably reflects the remuneration for the extent of the work which the agent undertakes to perform and is not included as a factor in determining the existence of an agency relationship; rather, agency depends upon the factors we have outlined. *See, e.g., Brewing Co. v. Hoder*, 123 Colo. 421, 425, 230 P.2d 170, 172–73 (1951) (sharing of profits did not negate agency relationship); *see also Restatement (Second) of Agency*, §§ 12–14 (method or amount of compensation not mentioned as an essential characteristic of agency relation); *Stortroen*, 736 P.2d at 397–98 (amount of compensation not mentioned as a factor).

In sum, the mere existence of a joint venture is not dispositive of the issue of whether an agency relationship existed. A joint venture or other partnership can be an agent. When written authorizations are ambiguous, the intent and acts of the parties control.

Based on the intent and acts of the parties, I conclude that Fey and the Zoo entered into an agency relationship. The creation of a joint venture agreement, in light of the parties' intent and in view of the law of agency, did not negate this agency relationship. The joint venture agreement was executed with the purpose of confirming the parties' intent that an agency relationship was in effect, not to create a separate enterprise.

The ALJ concluded that the "character of the seller changed when the Foundation and Fey entered into the joint venture agreement, and the exemption became inapplicable." However, the ALJ cited no factual basis for this legal conclusion. The key question in determining the chain of agency from one entity to another is not the identity of the party doing work at a given time, but the nature and structure of the relationships among parties. *See Stortroen*, 736 P.2d at 397–98.

The Zoo's profits, under the joint venture agreement, are thirty percent of the net income after all expenses are paid; Fey's share is seventy percent. Under the majority's holding that the joint venture is liable for the uncollected tax, the Zoo's profits drop from $32,840 to $19,735 when the seat tax is included as an expense, for a total reduction of $13,105. Fey's profits drop from $76,628 to $46,049, for a total reduction of $30,579. This loss to the Zoo and Fey occurs despite the overwhelming facts in this record that an agency relationship existed and despite the exemption in D.R.M.C. 53–347(3) that ticket sales "by the city or any department thereof" shall not be subject to the tax. Thus, the Zoo directly suffers the consequence of not collecting a seat tax for which it is not liable under Denver's ordinance. This is not what the parties intended and is contrary to the intent of Denver's ordinance.

### Conclusion

Fey was an agent of the Zoo in producing and promoting Zoofest; the joint venture agreement was not meant to alter the parties' purpose in this regard. The exemption to the seat tax provided in D.R.M.C. 53–347(3) should have been applied to the Zoofest concert series. The court of appeals correctly held that the ALJ misapplied the relevant legal standards and properly concluded that the exemption applied because the Zoo retained control over Zoofest and "used Fey's services as a surrogate for those of its own employees," thereby creating a chain of agency from the city to Fey.

Accordingly, I would affirm the judgment of the court of appeals.

I am authorized to say that Justice MARTINEZ joins in this dissent.